## State of Vermont v. Bahiyod Shabazz

[739 A.2d 666]

No. 98-276

Present: Amestoy, C.J., Dooley, Morse, Johnson and Skoglund, JJ.

Opinion Filed August 6, 1999

*William H. Sorrell*, Attorney General, and *David Tartter*, Assistant Attorney General, Montpelier, for Plaintiff-Appellee.

*Charles S. Martin* of *Martin & Associates*, Barre, for Defendant-Appellant.

**Skoglund, J.** Defendant appeals from a voluntary manslaughter conviction, claiming the district court erred by instructing the jury that either of two forms of implied intent to kill, the intent to do serious bodily injury and the extreme indifference to human life, satisfy the intent element of voluntary manslaughter. We affirm.

The incident occurred in the early morning hours of November 11, 1996, when Joel Martin, ultimately the victim, knocked on the door to

Mary Brooks's apartment. Defendant is Mary Brooks's brother and was inside her apartment at the time. When Brooks answered the door, Martin, disguised with a mask and a wig, pulled out what appeared to be a gun and demanded either crack cocaine or money — according to differing testimony at trial. Brooks and defendant left the apartment with Martin, ostensibly to go to another apartment to retrieve crack cocaine or money. Defendant picked up a knife as they left the apartment. A struggle ensued in the hallway, moving eventually outside into the parking lot. During the scuffle, Martin's mask fell off. Brooks and defendant both knew Martin. Again, testimony varied regarding whether defendant first stabbed Martin before or after Brooks managed to grab the gun and figure out that it was a plastic, toy gun. Brooks began hitting Martin with the gun and yelling that someone should call the police. By this point, defendant was on top of Martin in the parking lot. Martin was saying "let me up and I'll leave," and, when Brooks said to let him go, defendant got off him. Martin stood up, ran approximately twenty yards and then fell down. At the emergency room, no pulse could be detected, and Martin was declared dead. A subsequent autopsy revealed that he died from a stab wound to the heart.

Defendant was charged with murder. At trial, he argued that he stabbed Martin in self defense. The State argued that defendant stabbed Martin after learning the gun was plastic because he wanted to send a message not to try to rob crack dealers. In addition to instructing the jury on the doctrine of self defense, the trial judge gave the following charge on the lesser included offense of voluntary manslaughter.

> The question is whether, as a result of that provocation, the defendant actually intended to kill Joel Martin. That is what we refer to as an expressed intent. And an intent to kill may also consist of what is called an implied intent. It may be shown by proof that the defendant acted with intent to cause great bodily harm, or it may be proven that he acted in wanton disregard of the likelihood that his behavior might naturally cause death or great bodily harm.

> So that there are three ways that the State may prove or — and must prove intent. The — those are an actual intent to kill or an intent to cause great bodily harm or a wanton disregard that the likelihood that his acts would cause death or great bodily harm. Now, wanton disregard means that the

State must prove that the defendant actually knew that the likelihood — of the likelihood that his conduct might naturally cause death or great bodily harm, and nonetheless, engaged in the act of stabbing Joel Martin with a knife.

The defendant — for this to be proven, the defendant must actually or subjectively be aware that his conduct posed a very high risk of death or serious bodily injury to the victim. This intent element pertains to the state of mind or thoughts of the defendant's mind at or about the time of the alleged acts in question. Consideration of the mental elements requires you to examine and determine what was going on in the mind of the defendant at the time of the events in question, and then to decide whether the State has convinced you beyond a reasonable doubt that the defendant did, in fact, have the required intent at that time.

Defendant properly preserved his objection to the instruction, and the instant appeal followed.

On appeal, defendant claims that only involuntary manslaughter may be premised on an intent implied either from an indifference to human life or an intent to do serious bodily injury. He asserts that voluntary manslaughter requires an actual, express intent to kill.

■ In reviewing jury instructions, the relevant inquiry is whether the instructions as a whole were misleading or inadequate to aid the jury's deliberations. We will assign error only where the instructions undermine our confidence in the verdict. See *State v. Brooks*, 163 Vt. 245, 250, 658 A.2d 22, 26 (1995).

The manslaughter statute does not provide a definition for the offense, whether voluntary or involuntary. See 13 V.S.A. § 2304; see also *State v. Stanislaw*, 153 Vt. 517, 522-24, 573 A.2d 286, 289-90 (1990) (noting statute only establishes punishment for manslaughter, remaining silent on mens rea). We have long described the difference between voluntary and involuntary manslaughter as:

Manslaughter is the unlawful killing of another, without malice, and may be either voluntary, as when the act is committed *with a real design and purpose to kill, but through the violence of sudden passion occasioned by some great provocation,* which . . . the law considers sufficient to palliate the offenee; or involuntary, as when the death of another is caused by some unlawful act, not accompanied with any intention to take life.

*State v. McDonnell*, 32 Vt. 491, 545 (1860) (overruled on other grounds by *State v. Burpee*, 65 Vt. 1, 36, 25 A. 964, 974 (1892)) (internal quotation omitted). Recently, we have expounded that voluntary manslaughter is composed of: adequate provocation; inadequate time to regain self-control ("cool off"); actual provocation; and actual failure to cool off. See *State v. Shaw*, 168 Vt. 412, 415, 721 A.2d 486, 490 (1998); *State v. Turgeon*, 165 Vt. 28, 32, 676 A.2d 339, 342 (1996) (citing 2 W. LaFave & A. Scott, Substantive Criminal Law § 7.10, at 255 (1986)). And contemporary comparisons of voluntary and involuntary manslaughter have tended to juxtapose sudden passion as exemplary of the state of mind proper to voluntary manslaughter with the failure to perceive a reasonably apparent risk of causing death or great bodily harm as the state of mind for involuntary manslaughter. See *State v. Johnson*, 158 Vt. 508, 518-19 n.4, 615 A.2d 132, 138 n.4 (1992); *State v. Wheelock*, 158 Vt. 302, 310, 609 A.2d 972, 977 (1992). Yet, we have not had occasion to examine carefully the mens rea negated by sudden passion, great provocation, or diminished capacity in voluntary manslaughter.

Prior voluntary manslaughter cases have not delved into the "intent to kill" description of voluntary manslaughter but have instead elaborated the mitigation aspect of the offense, commonly known as heat of passion or adequate provocation and sometimes also referred to as the state of mind for voluntary manslaughter. See *Turgeon*, 165 Vt. at 33, 676 A.2d at 342 (voluntary manslaughter is time sensitive doctrine, meaning that adequately provoked individual must not have had time to cool off before acting); *Johnson*, 158 Vt. at 518-19 n.4, 615 A.2d at 138 n.4 (in straightforward terminology, voluntary manslaughter is intentional killing committed under extenuating circumstances that would mitigate, but not justify, killing, such as provocation that would cause reasonable person to lose self control). In *Johnson*, we discussed the changeover in homicide terminology from "malice aforethought" to specific states of willfulness for each type of murder, and, because the term "malice" created a potential source of confusion for jurors, we indicated trial courts should no longer use the word in their jury instructions. See 158 Vt. at 515-19, 615 A.2d at 136-38. Our one recent, brief discussion of "intent to kill" in voluntary manslaughter noted the effect this changeover in terminology had on the description of the offense. See *State v. Hatcher*, 167 Vt. 338, 345, 706 A.2d 429, 433 (1997). Whereas voluntary manslaughter had traditionally been characterized as an intentional killing committed under extenuating circumstances

occasioning sudden passion or great provocation that negate "malice," see *State v. Duff*, 150 Vt. 329, 331, 554 A.2d 214, 215 (1988), overruled on other grounds by *State v. Powell*, 158 Vt. 280, 286, 608 A.2d 45, 48 (1992); *In re Estate of Mahoney*, 126 Vt. 31, 35, 220 A.2d 475, 478 (1966) (voluntary manslaughter is distinguished by absence of malice, with intent caused by heat of passion), in *Hatcher* we simply substituted the word "willfulness" for malice. See 167 Vt. at 345, 706 A.2d at 433. We did not, however, further analyze the mens rea or intent element.

By contrast, we have had the opportunity to analyze in more depth the *McDonnell* description of involuntary manslaughter. In *State v. Stanislaw*, we stated that the common law precedents characterizing involuntary manslaughter as a "killing caused by an unlawful act, but not accompanied with *any* intention to take life," served, not to dispense with all mens rea requirements, but merely to distinguish involuntary from voluntary manslaughter. See 153 Vt. at 522, 573 A.2d at 289 (emphasis added). We concluded that the phrase "not accompanied with any intention to take life" did not enunciate "what level of intent, if any, in the commission of the underlying unlawful act is necessary to sustain a conviction for involuntary manslaughter." *Id.* at 522, 573 A.2d at 290. Consequently, we went on to clarify that either recklessness or criminal negligence, as defined by the Model Penal Code (MPC), satisfies the state of mind for involuntary manslaughter. See *Brooks*, 163 Vt. at 251, 658 A.2d at 26-27 (clarifying that, pursuant to MPC definitions, recklessness consists of conscious disregard of risk of death or injury to another whereas criminal negligence involves unreasonable disregard of risk); *Stanislaw*, 153 Vt. at 525, 573 A.2d at 291 (adopting MPC definition of criminal negligence); *State v. Forbes*, 147 Vt. 612, 617, 523 A.2d 1232, 1235 (1987) (either reckless or negligent conduct could sustain conviction for involuntary manslaughter). Both the recklessness and criminal negligence standards require that, taking an objective view of the risk, disregard of it must rise to the level of a gross deviation from the standard of care that a law-abiding person would observe in the actor's situation. See *Brooks*, 163 Vt. at 251, 658 A.2d at 26-27.

■ Defendant first urges us to read the "intent-to-kill" description of voluntary manslaughter as just that: an actual, express intent. We note however, as we did in *Stanislaw*, that the description of voluntary manslaughter stemming from *McDonnell* has functioned more to distinguish voluntary from involuntary manslaughter than to circumscribe a complete set of possible voluntary manslaughter

scenarios. A descriptive definition should not be mistaken for a prescriptive one. Thus, we will not accept this description of the most commonly negated mens rea for voluntary manslaughter as dictating the only possible one for the offense. See 2 W. LaFave & A. Scott, Substantive Criminal Law § 7.10, at 253 (1986) ("Most killings which constitute voluntary manslaughter are of the intent-to-kill sort — so much so that voluntary manslaughter is often defined in the cases . . . as if intent to kill were a required ingredient. But . . . they might be of the intent-to-do-seriously-bodily-injury, or of the depraved-heart, types."). Indeed, one court that insisted intent to kill was a required element of voluntary manslaughter later overruled itself. See *State v. Pettit*, 445 N.W.2d 890 (Neb. 1989) (overruled by *State v. Jones*, 515 N.W.2d 654, 659 (Neb. 1994), overruled on other grounds by *State v. Burlison*, 583 N.W.2d 31 (Neb. 1998)). The better view of the phrase "intent to kill" is that it serves as a short-hand description of the fuller definition of the mental state for second degree murder, thereby also encompassing intent to do serious bodily injury as well as extreme indifference to human life. See *United States v. Paul*, 37 F.3d 496, 499 (9th Cir. 1994); *Comber v. United States*, 584 A.2d 26, 42-43 (D.C. Ct. App. 1990).

In support of his literal reading of the intent-to-kill description, defendant next argues that all types of implied intent are subsumed under involuntary manslaughter, leaving no room for implied intent in voluntary manslaughter. Because the Legislature sets just one punishment for manslaughter but furnishes no definition that would thereby distinguish between a voluntary and an involuntary offense, we must derive the definition for the two distinct types of manslaughter from common law precedents. Although we adopted the MPC definition of recklessness in *Brooks*, we observe that the MPC definition of manslaughter contains rough corollaries for involuntary and voluntary but does not explicitly break manslaughter down in those terms.

Criminal homicide constitutes manslaughter when:

(a) it is committed recklessly; or

(b) a homicide which would otherwise be murder is committed under the influence of extreme mental or emotional disturbance for which there is reasonable explanation or excuse. The reasonableness of such explanation or excuse shall be determined from the viewpoint of a person in the

actor's situation under the circumstances as he believes them to be.

See Model Penal Code § 210.3(1) (1962).

The fact that our Legislature has not adopted the MPC definition of manslaughter and that the MPC definition is different from ours in significant respects, such as excluding any type of negligence from the definition's purview, may have created the possibility for confusion. While the inexact MPC corollary for involuntary manslaughter, i.e., the reckless type, refers to a state of mind defined elsewhere in the MPC, the approximate corollary to voluntary manslaughter, i.e., the extreme-emotional-disturbance type, is not similarly well-defined. This may have caused further confusion. Hence, it is time for a clearer statement of the law.

The jury instruction at issue described the type of implied intent applicable to voluntary manslaughter as "wanton disregard," which defendant appears to equate with the reckless disregard pertaining to involuntary manslaughter. It is true that "wanton" is often used together with and indistinguishably from "willful" and "reckless" in describing gross negligence. See, e.g., Black's Law Dictionary 1034 (6th ed. 1990) (noting common usage of willful, wanton or reckless negligence and that it has tended to merge with term gross negligence); see also *Green v. Sherburne Corp.*, 137 Vt. 310, 312-13, 403 A.2d 278, 280 (1979) (noting that differentiation between willful and gross negligence is not part of our common law but is imported from guest-passenger statute which was since repealed, and that these terms have not persisted as definitions effective at law). As the MPC's definition of "recklessness" demonstrates, it has avoided blurring the three terms (willful, wanton, and reckless), see Model Penal Code § 2.02(2)(c); *Brooks*, 163 Vt. at 251, 658 A.2d at 26 (quoting definition), and we will do so as well.

■ "Wanton" is employed in a context apart from negligence where it retains a meaning distinct from mere recklessness. It was long used to define malice aforethought for the purposes of criminal homicide: "an intent willfully to act in callous and wanton disregard of the consequences to human life." Blacks Law Dictionary 957 (6th ed. 1990); see *State v. Brunell*, 159 Vt. 1, 4, 615 A.2d 127, 129 (1992) (malice aforethought means wanton disregard of value of human life); cf. *Johnson*, 158 Vt. at 515, 615 A.2d at 136 (describing evolution of malice definition). And this is what "wanton" referred to in the jury instruction that the defendant contests. We now clarify what has long

been implicit in our voluntary manslaughter case law. Whereas the recklessness pertaining to involuntary manslaughter is conduct that disregards the *possible* consequence of death resulting, the wantonness pertaining to voluntary manslaughter is extremely reckless conduct that disregards the *probable* consequence of taking human life.

In accordance with our direction in *Johnson* that jury instructions should use the mental states themselves rather than the term malice, see 158 Vt. at 519, 615 A.2d at 138, the instruction given to the jury here properly delineated the three types of mens rea that would ordinarily constitute murder if not mitigated to voluntary manslaughter. Thus, there was no error. In light of this conclusion, we need not further address defendant's claim that the instruction allowed the jury to find him guilty of voluntary manslaughter based on the state of mind for a distinctly separate crime, that is, involuntary manslaughter.

*Affirmed.*