# State of Vermont v. Robert William Blish

[776 A.2d 380]

No. 99-373

Present: **Amestoy, C.J., Dooley, Morse, Johnson and Skoglund, JJ.**

Opinion Filed April 13, 2001

Motion for Reargument Denied May 15, 2001

· ·*William H. Sorrell*, Attorney General, and *David Tartter*, Assistant Attorney General, Montpelier, for Plaintiff-Appellee.

. *Robert Appel*, Defender General, and *William A. Nelson*, Appellate Attorney, Montpelier, for Defendant-Appellant.

**Skoglund, J.** Defendant Robert William Blish appeals the Windsor District Court's entry of his guilty plea to the charge of second degree murder. Defendant contends that: (1) the crime described to him in the trial judge's Rule 11(c) colloquy during his plea hearing was voluntary manslaughter, not second degree murder, and therefore the colloquy cannot support his conviction for second degree murder; (2) as a result of this defect, the judge was unable to establish a factual basis for his plea, as required by V.R.Cr.P. 11(f); and (3) as a result of these errors, his plea was involuntary and the court's acceptance of it was therefore in violation of his due process rights. As the plea colloquy was sufficient to satisfy the requirements of Rule 11(c), we affirm.

It is uncontested that on October 12, 1996, defendant shot and killed Plinio Raphael Diaz. The pertinent evidence, for purposes of this appeal, pertaining to the circumstances surrounding this killing is as follows. In the early morning on the date in question, defendant, Diaz, and Debra Secord were traveling together in Diaz's car, en route from Claremont, New Hampshire to Ascutney, Vermont. The car was driven by Secord, with defendant riding in the front seat and Diaz alone in the left rear seat. While driving along State Route 131 in Ascutney, defendant and Diaz exchanged insults. Defendant referred to Diaz as "nigger," and Diaz responded by calling defendant "fat boy." When Diaz called defendant "fat boy," defendant pulled out a handgun, turned around to face Diaz, and shot him in the face, killing him. Defendant stated immediately thereafter "[t]here, call me fat boy again."

The information, entered on October 15, 1996, charged defendant with first degree murder. At that time, defendant pled not guilty, and remained in custody. On February 5, 1997, after defendant underwent two separate competency evaluations, a competency hearing was held, and defendant was found competent to stand trial. In the following months, the case proceeded towards trial. On November 3, eleven days before the jury trial was scheduled to begin, defendant entered into a plea agreement. Under the agreement, the State would dismiss separate charges of aggravated assault, unlawful mischief, and attempt to elude, and in exchange defendant would plead guilty to

second degree murder, with the State recommending a sentence of fifteen years to life.

At the plea hearing on the same date, with his counsel present, defendant replied affirmatively to the judge's inquiries about whether he had been accorded an opportunity to review the amended charge of second degree murder, and if he was ready to enter a plea at that time. He then pled guilty as agreed, and the judge engaged him in a V.R.Cr.P. Rule 11(c) colloquy concerning the nature of the crime charged, attempting to establish that he understood each of the elements of the crime of second degree murder. After acknowledging his understanding of the first two elements of the crime — that, as the judge characterized these elements, there was an unlawful killing of the victim, and that defendant's conduct had caused this unnatural death — the judge proceeded to discuss the three possible states of mind which can satisfy the mens rea requirement for second degree murder.

The judge first asked defendant if he had intended to kill the victim, to which defendant responded that he both understood the meaning of intent to kill and had not so intended.* Defendant was next asked if he had intended to do great bodily harm to the victim. He responded that he had never intended to do bodily harm.

The judge then presented the third mens rea possibility, that he "knowingly created a very high risk of death or great bodily harm." The judge further described this third possible mental state as "[i]n other words, your shooting of the weapon created a very high risk that the man would die or he would receive serious bodily injury that would cause protracted use of a bodily member or organ or might result in his death." Defendant agreed that this type of mens rea for second degree murder could be satisfied in this case. The judge concluded that the court was satisfied with the factual basis for the third element of the offense, and continued on with the colloquy.

At the end of the colloquy, the judge stated that "based on the plea of guilty to the amended charge of second degree murder and the discussion I've had with Mr. Blish, I will find that the plea is knowing, voluntarily and intelligently made, with knowledge and understanding of its consequences and that there is a fact basis for the plea." The

---

* During this portion of the colloquy, defendant stated that the act he committed was in self-defense. After the judge explored this concept with defendant, defendant stated that, now that he had "a clear mind," he understood the nature of the defense of self-defense, and he also understood that by pleading guilty he was giving up the right to make that defense.

judge again asked the prosecution and defense counsel whether there was "anything else," and both said no.

Defendant first argues that the colloquy between himself and the judge violated Rule 11(c)(1) because the judge did not adequately explain the nature of the charge to which the plea was offered. See V.R.Cr.P. 11(c) ("The court shall not accept a plea of guilty . . . without first, by addressing the defendant personally in open court, informing him of and determining that he understands the following: (1) the nature of the charge to which the plea is offered.").

▮ Before an examination of the substantive argument presented by defendant, we must first address the standard of review applied to a claim of a violation of Rule 11(c) when such claim is, as here, made in a direct appeal to this Court. It is well established in Vermont that "an issue under Rule 11(c), alleging violations in taking a plea, absent plain error, demands a factual record and opportunity for the trial court to grant relief before this Court may properly review it." *State v. Thompson*, 162 Vt. 532, 534, 650 A.2d 139, 140 (1994); see also *State v. West*, 164 Vt. 192, 203 n.*, 667 A.2d 540, 547 n.* (1995) (Morse, J., concurring and dissenting) (citing *Thompson* with approval); *State v. Ploof*, 162 Vt. 560, 562-63, 649 A.2d 774, 776 (1994) (same). In *Thompson*, the defendant brought a direct appeal to this Court from a plea of nolo contendere to, and subsequent conviction on, charges of sexual assault. In that appeal defendant raised a challenge to the plea based on alleged violations of Rule 11(c), claiming the court failed to both inform him of, and determine whether he understood, the nature of the crimes charged. *Thompson*, 162 Vt. at 533, 650 A.2d at 139. We held that the proper channel for defendant to bring his claim was through post-conviction relief in superior court, as there was no plain error present which warranted this Court's review. *Id.* at 534, 650 A.2d at 140. Defendant argues that we should revisit the plain error standard of review we apply to claims of Rule 11(c) violations made directly from the plea hearing to this Court. Because it will have no effect on the outcome of this case, we decline this invitation and hold that there was no error in the Rule 11(c) colloquy in this case.

Defendant does not dispute the fact that he killed Diaz. Rather, he claims that, in a line of cases beginning with *State v. Johnson*, 158 Vt. 508, 615 A.2d 132 (1992), and *State v. Brunell*, 159 Vt. 1, 615 A.2d 127 (1992), this Court has sought to reformulate in more modern language the traditional common law definitions of second degree murder, voluntary manslaughter, and involuntary manslaughter. He contends, citing *State v. Hatcher*, 167 Vt. 338, 344, 706 A.2d 429, 432 (1997),

*Brunell,* 159 Vt. at 7-8, 615 A.2d at 130-31, *Johnson,* 158 Vt. at 515, 615 A.2d at 136, and *State v. Doucette,* 143 Vt. 573, 582, 470 A.2d 676, 682 (1983), that the distinction between these crimes is marked by the degree and character of the actor's recklessness, with second degree murder representing conduct manifesting an extreme indifference to human life, and the risk of death resulting from the actor's conduct must be more than a mere unreasonable risk, or even a high degree of risk. Defendant further contends that the definition provided by the trial judge at the plea hearing, that he "knowingly created a very high risk of death or great bodily harm," constitutes the crime of reckless homicide, or manslaughter, and not second degree murder.

Defendant is correct that we have recently endeavored to modernize, and in so doing clarify, the distinct definitions for the various types of criminal homicide. However, defendant's attempted distillation of our description of the three mens rea possibilities for second degree murder is not as close to the mark. We have recently, subsequent to *Johnson, Brunell, Hatcher,* and *Doucette,* specifically identified the mens rea requirement for second degree murder. In *State v. Shabazz,* 169 Vt. 448, 739 A.2d 666 (1999), we were presented with a challenge to jury instructions describing the crime of voluntary manslaughter. The defendant, Bahiyod Shabazz, stabbed and killed a man during a failed robbery attempt. The testimony at trial varied as to the purpose of the robbery, but provided that the robber was seeking either crack cocaine or money. After the robbery was in progress, a scuffle ensued, and the robber was disarmed and unmasked. The unmasking revealed that the robber was a person known to Shabazz, and the disarming revealed that the gun presented by the robber was in fact a toy.

The testimony at trial varied as to whether Shabazz stabbed the robber before or after discovering the gun was a toy. He was eventually charged with murder for the killing, but argued that his actions were in self-defense. At the conclusion of the trial, the judge instructed the jury on the doctrine of self-defense, as well as on the lesser-included offense of voluntary manslaughter. He stated that there are three ways that the prosecution may prove the intent requirement of voluntary manslaughter — by proving "an actual intent to kill or an intent to cause great bodily harm or a wanton disregard that the likelihood that his acts would cause death or great bodily harm." *Id.* at 449, 739 A.2d at 667. The trial judge in that case elucidated on the concept of wanton disregard, defining it for the jury as the condition where "the defendant actually knew . . . of the

likelihood that his conduct might naturally cause death or great bodily harm, and nonetheless, engaged in the act." *Id.* at 450, 739 A.2d at 667. He was subsequently convicted of voluntary manslaughter.

On appeal, Shabazz argued that the jury instruction was insufficient to support his conviction for voluntary manslaughter, as only involuntary manslaughter, and not voluntary manslaughter, may be premised on intent to kill implied from indifference to human life or intent to do serious bodily injury. *Id.* We disagreed, holding that the mens rea requirement for voluntary manslaughter could indeed be premised upon implied intent, and that "[t]he better view of the phrase 'intent to kill' [as used in the definition of voluntary manslaughter] is that it serves as a short-hand description of the fuller definition of the mental state for second degree murder." *Id.* at 453, 739 A.2d at 669. We described the "intent to kill" required for second degree murder as including actual intent to kill, and also "encompassing intent to do serious bodily injury as well as extreme indifference to human life." *Id.* We held that there was no error in the jury instruction, and that it "properly delineated the three types of mens rea that would ordinarily constitute murder if not mitigated to voluntary manslaughter." *Id.* at 455, 739 A.2d at 670.

The confusion displayed by defendant over the nature of the mens rea requirement for second degree murder, and its correlation to that required for voluntary manslaughter, indicates that clarification is in order. It is well established in Vermont that "[v]oluntary manslaughter is an intentional killing committed under extenuating circumstances that may negate willfulness, such as sudden passion or provocation that would cause a reasonable person to lose control." *Hatcher*, 167 Vt. at 345, 706 A.2d at 433 (citing *State v. Turgeon*, 165 Vt. 28, 32, 676 A.2d 339, 342 (1996), and *State v. Wheelock*, 158 Vt. 302, 310, 609 A.2d 972, 977 (1992)); see also *Shabazz*, 169 Vt. at 451-52, 739 A.2d at 668 (voluntary manslaughter has "traditionally been characterized as an intentional killing committed under extenuating circumstances occasioning sudden passion or great provocation that negate 'malice' ") (citing *State v. Duff*, 150 Vt. 329, 331, 554 A.2d 214, 215 (1988); *In re Estate of Mahoney*, 126 Vt. 31, 35, 220 A.2d 475, 478 (1966)); *State v. Pelican*, 160 Vt. 536, 543, 632 A.2d 24, 29 (1993) (Morse, J., concurring) ("Although we have spoken previously of diminished capacity as 'negating' malice, the correct way of explaining its effect is as a defense mitigating the degree of homicide from murder to voluntary manslaughter. Like second degree murder, voluntary manslaughter is an intentional killing, but, unlike second degree murder, it is

'committed under extenuating circumstances that would mitigate, but not justify, the killing.' ").

This view is consistent with the textbook definition of voluntary manslaughter. See 2 C. Torcia, Wharton's Criminal Law § 155, at 346-47 (15th ed. 1994) ("Voluntary manslaughter is an intentional killing in the heat of passion as a result of severe provocation. . . . which would otherwise constitute murder, [but] is mitigated to voluntary manslaughter."). Furthermore, our definition is in accord with a majority of states which recognize voluntary manslaughter as a distinct crime:

> Voluntary manslaughter in most jurisdictions consists of an intentional homicide committed under extenuating circumstances which mitigate, though they do not justify or excuse, the killing. The principal extenuating circumstance is the fact that the defendant, when he killed the victim, was in a state of passion engendered in him by an adequate provocation
> . . . .
>
> . . . .
>
> The usual view of voluntary manslaughter thus presupposes an intent to kill (or perhaps an intent to do serious injury or to engage in very reckless conduct), holding that in spite of the existence of this bad intent the circumstances may reduce the homicide to manslaughter.

2 W. LaFave and A. Scott, Substantive Criminal Law § 7.10, at 252, 254 (1986) (citing cases). See also *Commonwealth v. Whitman*, 722 N.E.2d 1284, 1288 (Mass. 2000) ("Voluntary manslaughter . . . is a crime that would otherwise be murder if a killing arises from a sudden transport of passion or heat of blood upon a reasonable provocation or upon sudden combat.") (internal quotations omitted); *Selby v. State*, 761 A.2d 335, 342 (Md. 2000) (voluntary manslaughter is "an *intentional* homicide, done in a sudden heat of passion, caused by adequate provocation, before there has been a reasonable opportunity for the passion to cool") (emphasis in original); *People v. Breverman*, 960 P.2d 1094, 1100 (Cal. 1998) ("[H]eat of passion and unreasonable self-defense reduce an intentional, unlawful killing from murder to voluntary manslaughter by *negating the element of malice* that *otherwise inheres* in such a homicide.") (emphasis in original); *State v. Hockenhull*, 525 A.2d 926, 929 n.4 (R.I. 1987) ("Although voluntary manslaughter has been defined as an intentional killing, such intent is

either mitigated by heat of passion resulting from adequate provocation or is reduced to a general intent rather than a specific intent crime as a result of diminished capacity."); *Commonwealth v. Pitts*, 404 A.2d 1305, 1308 (Pa. 1979) ("Voluntary manslaughter . . . involves the specific intent to kill but, by reason of passion and provocation, contains no legal malice."); *State v. Hilliker*, 327 A.2d 860, 865 (Me. 1974) ("An unlawful killing is punishable as voluntary manslaughter, 'as when the act is committed with a real desire and purpose to kill but · in the heat of passion occasioned by sudden provocation.' "); cf. N.Y. Penal Law § 125.20(2) (McKinney 1998) ("The fact that homicide was committed under the influence of extreme emotional disturbance constitutes a mitigating circumstance reducing murder to manslaughter in the first degree . . . .").

■■■ As previously noted, and consistent with the aforementioned definitions of voluntary manslaughter, we have specifically held that the intent component of voluntary manslaughter is the same as that required for second degree murder — actual intent to kill, intent to do serious bodily injury, or extreme indifference to human life. *Shabazz*, 169 Vt. at 453, 739 A.2d at 669. This extreme indifference to human life may be characterized as knowing of the likelihood that the act might naturally cause death or great bodily harm, but engaging in the action nonetheless, see *id.* at 455, 739 A.2d at 670 (recognizing correctness of jury instruction so describing the third mens rea element), or, as described by the trial court judge in this case, the knowing creation of a very high risk of death or great bodily harm. The critical factor distinguishing second degree murder from voluntary manslaughter is not the mental state of the actor, but the existence of mitigating circumstances. See *id.* at 451-52, 739 A.2d at 668 ("[V]oluntary manslaughter is composed of: adequate provocation; inadequate time to regain self-control ('cool off '); actual provocation; and actual failure to cool off. . . . [V]oluntary manslaughter had traditionally been characterized as an *intentional* killing committed under extenuating circumstances occasioning sudden passion or great provocation that negate 'malice.' ") (emphasis added).

■■ Defendant repeatedly claims that the mens rea he pled to encompassed a degree and character of risk which constitutes simple recklessness. We disagree. In light of the *Shabazz* trial court judge's parallel definition of the third mens rea element possibility as a "wanton disregard of the likelihood that his behavior might naturally cause death or great bodily harm," *id.* at 449, 739 A.2d at 667, we

distinguished "wanton" from "reckless" as they apply to voluntary and involuntary manslaughter. "Whereas the recklessness pertaining to involuntary manslaughter is conduct that disregards the *possible* consequence of death resulting, the wantonness pertaining to voluntary manslaughter is extremely reckless conduct that disregards the *probable* consequence of taking human life." *Id.* at 455, 739 A.2d at 670 (emphasis in original). In light of the higher penalties associated with a second degree murder conviction, compare 13 V.S.A. § 2303(b) (establishing sentence range for second degree murder at twenty years to life imprisonment, absent mitigating or aggravating circumstances); with 13 V.S.A. § 2304 (establishing sentence range for manslaughter convictions as between one year minimum to fifteen year maximum imprisonment), this distinction is consistent with our recognition that knowing or voluntary action involves a higher degree of culpability than reckless or negligent behavior, and reckless action invokes lesser criminal liability than knowing action. *State v. Bolio*, 159 Vt. 250, 252-53, 617 A.2d 885, 886 (1992). Here, the trial judge properly characterized the mens rea requirement for second degree murder as either intent to kill, intent to do great bodily injury, or knowingly creating a very high risk of death or great bodily harm. In so doing, he did not characterize any of the possible elements of mens rea as recklessness or as engaging in conduct which disregarded a *possibility*, rather than a *probability*, of death resulting. Defendant pled to knowingly creating a very high risk of death or great bodily harm. The instruction at issue here was in conformity with our contemporary description of the mens rea for second degree murder, and, therefore, there was no error in the Rule 11(c) colloquy.

Defendant also argues that because the factual basis of the offense admitted by defendant during the colloquy consisted of simple recklessness, the plea-taking colloquy failed to establish a factual basis for the plea. See V.R.Cr.P. 11(f) ("Notwithstanding the acceptance of a plea of guilty, the court should not enter a judgment upon such plea without making such inquiry as shall satisfy it that there is a factual basis for the plea."). We have held that Rule 11(f) requires not only that a court perform an inquiry to satisfy that there is a factual basis for a defendant's guilty plea, but also that the defendant understand that the conduct admitted violates the law as explained by the court. *State v. Yates*, 169 Vt. 20, 25, 726 A.2d 483, 486 (1999) (citing *In re Dunham*, 144 Vt. 444, 451, 479 A.2d 144, 148 (1984); *In re Kasper*, 145 Vt. 117, 120, 483 A.2d 608, 610 (1984)).

As previously discussed, there was no error in the definition of second degree murder that was provided by the trial judge, and which the defendant agreed could be proven by the prosecution. The record from the plea hearing clearly shows not only that defendant was presented with the correct elements of the crime pled, but also that he understood these elements and believed the State could prove these elements at trial.

Furthermore, *Dunham* and *Yates*, which defendant relies upon for his Rule 11(f) argument, are distinguishable from the present case. In *Dunham*, the defendant pled to second degree murder for his role involving the murder of an accomplice to an earlier attempted burglary. At the change-of-plea hearing, a written plea agreement was submitted to the court, in which defendant agreed to plead guilty to second degree murder and to testify against another defendant charged with the same murder, in exchange for an agreed-upon sentence. At the hearing, the prosecutor read into the record a description of the events constituting the offense charged. After presenting a description of the events immediately preceding the murder, the defendant testified briefly as to what he saw and did during that time. After defendant testified, the prosecutor requested that the court inquire as to the willfulness element of second degree murder, because the prosecutor did not believe the defendant's testimony had established this element. The record showed that there was no further inquiry made of defendant, and that the prosecutor's request went unanswered. *Dunham*, 144 Vt. at 445-47, 479 A.2d at 145-46.

We reversed, vacating the judgment and sentence imposed, and granting defendant leave to withdraw his guilty plea. In so doing, we recognized that the court failed to comply with Rule 11(f) by not establishing a "factual basis for the willful element of second degree murder." *Id.* at 448, 479 A.2d at 147. We held that:

> Since the defendant's understanding of the elements of an offense as applied to the facts goes directly to the voluntariness of [the] plea, the record must affirmatively show sufficient facts to satisfy each element of an offense. The requirement of V.R.Cr.P. 11(f) involves an understanding by the defendant that the conduct admitted violates the law as explained to him by the court.

*Id.* at 451, 479 A.2d at 148.

In *Yates*, the defendant had pled guilty to aggravated domestic assault and simple assault. The charges arose out of an incident involving his then-wife and a friend of hers. The charge of aggravated domestic assault was based on acts committed by defendant against his then-wife, and the simple assault charge was based on acts committed against her friend. At a status conference, the court accepted the pleas, entered judgment, and sentenced defendant according to the agreement. Approximately six months later, defendant moved to withdraw his guilty plea to the aggravated domestic assault charge. At the status conference where the pleas were accepted, the court failed to make any inquiry into the facts concerning the altercation with defendant's then-wife, instead soliciting facts which concerned only the altercation with her friend. *Yates*, 169 Vt. at 23-24, 726 A.2d at 486.

While recognizing that a court may obtain facts about the case from sources other than the defendant, such as prosecutor and presentence reports, we held that "ultimately, the court's inquiry into the accuracy of the plea must be addressed personally to the defendant." *Id.* at 24, 726 A.2d at 486. *Yates* reiterated the proposition that Rule 11(f) requires "the defendant admit to and possess an understanding of the facts as they relate to the law for all elements of the charge or charges to which the defendant has pleaded." *Id.* "The accuracy of the factual basis goes to the defendant's understanding of the relationship between the law and the facts, which ultimately goes to voluntariness. The defendant's understanding cannot be probed except through personal interrogation, which then appears in the record of the proceedings." *Id.* at 26-27, 726 A.2d at 487-88. We held the court's failure to establish any factual basis for the aggravated domestic assault charge was a total violation of Rule 11(f). *Id.* at 24, 726 A.2d at 486.

■ Neither *Dunham* nor *Yates* assists this defendant in his claim. In this case, there was no failure to adhere to the requirements of Rule 11(f). The record shows that the court fully engaged the defendant in an inquiry on each of the elements of the crime being pled to. The defendant acknowledged that there had been an unlawful killing of Diaz, that he had perpetrated the killing, and that, in pointing a gun at Diaz's face and pulling the trigger, he was knowingly creating a very high risk of death or great bodily injury. These affirmations suffice to support the factual basis for the crime of second degree murder, and in so doing satisfy the requirements of Rule 11(f).

Defendant further argues that the plea colloquy constituted a violation of due process, based on his aforementioned arguments of error. For this proposition he cites *Henderson v. Morgan*, 426 U.S. 637 (1976), which he argues is materially indistinguishable from the case at bar. The defendant in *Henderson* appeared in state court, with counsel, and pled guilty to second degree murder. In the colloquy with the trial judge, the defendant stated that he understood that he was accused of killing the victim, that he was waiving his right to trial by jury, and that he would be sent to prison. There was no mention of the elements of second degree murder. At a later hearing in federal district court, challenging the plea, defendant testified that, had he known that intent to kill was an element of second degree murder, he would not have pled guilty to that crime. The United States Supreme Court stated that "such a plea cannot support a judgment of guilt unless it was voluntary in a constitutional sense." *Id.* at 644-45. It elaborated on the notion of the voluntary nature of a guilty plea, describing a plea as involuntary "either because the accused does not understand the nature of the constitutional protections that he is waiving, or because he has such an incomplete understanding of the charge that his plea cannot stand as an intelligent admission of guilt." *Id.* at 645 n.13 (internal citations omitted). The plea at issue, the Court stated, "clearly . . . could not be voluntary in the sense that it constituted an intelligent admission that he committed the offense unless the defendant received real notice of the true nature of the charge against him, the first and most universally recognized requirement of due process." *Id.* at 645 (internal quotations omitted). The Court noted that there was no support in the record for a finding that the defendant had the requisite intent to support the guilty plea. There was no evidence that defendant had ever been informed of the intent element of second degree murder, and therefore, "[s]ince [he] did not receive adequate notice of the offense to which he pleaded guilty, his plea was involuntary and the judgment of conviction was entered without due process of law." *Id.* at 647. Justice Byron White's concurrence, joined by Justices Potter Stewart, Harry Blackmun, and Lewis Powell, further refined the issue as it pertains to the case at bar, stating:

> The problem in this case is that the defendant's guilt has been established neither by a finding of guilt beyond a reasonable doubt after trial nor by the defendant's own admission that he is in fact guilty. The defendant did not expressly admit that he intended the victim's death (such

intent being an element of the crime for which he stands convicted); and his plea of guilty cannot be construed as an implied admission that he intended her death because the District Court has found that he was not told and did not know that intent to kill was an element of the offense with which he was charged.

*Id.* at 649 (White, J., concurring).

The *Henderson* concurrence's description of that case clearly illustrates its distinction from the case at bar. In the present case, not only were all the elements of the crime pled to presented to defendant, but the intent element was both presented and admitted to by the defendant. There has been no claim made that the defendant did not intend to kill the victim, as such intent was described to him, and he has not claimed that he would not have pled to second degree murder even if there had been an error in the colloquy, which we have held there was not. In this defendant's plea colloquy, there was no lack of voluntariness as described in *Henderson*. As we have found no error in either the Rule 11(c) colloquy or the Rule 11(f) inquiry into the factual basis of the plea, defendant's due process claim is without merit.

*Affirmed.*