2004 VT 31

**STATE of Vermont v. Nikoll MARKU**

[850 A.2d 993]

No. 02-188

¶ 1. March 30, 2004. Defendant Nikoll Marku appeals the trial court's admission of his guilty plea to attempted second degree murder. Defendant argues that the court erred in finding appellant competent to enter a plea and accepting defendant's plea without sufficient compliance with the requirements established by Rule 11 of the Vermont Rules of Criminal Procedure. We affirm.

¶ 2. Defendant is an Albanian refugee who entered the United States in 1992. On April 1, 1998, defendant went to the gas station where the victim worked, made small talk with him, and told the victim to "get ready, I'm going to kill you." Defendant then stabbed the victim in the head and neck, kicked him when he was down, and left. The two men were acquaintances, and had some minor friction over payment for a vehicle that the victim had apparently sold to defendant. The cause of the attack, however, is not entirely clear. At the time of his arrest, defendant denied any involvement in the incident.

¶ 3. Defendant is not fluent but understands English. The trial court found that his use of English was "not precise, but generally accurate." Although an interpreter was available at all proceedings, the court observed that defendant never sought clarification from the interpreter and that defendant "virtually refuse[d] to speak through the interpreter," preferring to respond directly in English.

¶ 4. In September 1999, the court ordered the first of three psychiatric evaluations, after defense counsel questioned defendant's competency and re-

ported that defendant refused to submit to the defense's psychological testing. Relying on the correctional mental health records, this first report relates that defendant had been placed in segregation on several occasions because of a variety of aggressive and bizarre behaviors, including fighting, yelling and chanting, bathing in the toilet, and flooding his cell with urine and feces. Defendant repeatedly refused mental health assessments or services. Defendant was diagnosed with adjustment disorder, a possible personality disorder, and a "possible history of regressive deterioration while in corrections." Nevertheless, the evaluating psychiatrist — Dr. Linder — observed that during the interview defendant was "alert and oriented to person, place and time." According to the report, defendant was focused, spoke coherently, and no hallucinations or delusions were noted.

¶ 5. Based on his interview with defendant, Dr. Linder gave "reserved support" to the opinion that defendant was competent to stand trial. Dr. Linder reported that defendant understood the charges but was not well versed in the particulars of the pending legal proceedings. Defendant did not entirely understand the public defender's role, and he was not familiar with plea bargaining. He did know, however, that he could testify on his own behalf and call witnesses in his defense. Defendant also understood that it was the State's burden to prove the case against him, and that a jury would decide the case. Dr. Linder observed that defendant was attentive and was able to retain the explanation of trial mechanics. Dr. Linder cautioned, however, that the determination of competence was hindered by defendant's limited cooperation, and language and cultural barriers. During the interview, defendant denied the charges and was not interested in discussing plea bargaining or the possibility of an insanity defense. According to Dr. Linder, defend-

ant "seemed overly optimistic about being released and showed little interest in the interview because of that."

¶ 6. In May 2000 defendant appeared for a competency hearing. Defense counsel stipulated to the admission of Dr. Linder's report and told the court that he had no countervailing medical testimony. The court examined defendant on a variety of subjects, including his family, his behavior in jail, and his understanding of trial proceedings. Defendant responded "I don't know" to some simple questions such as what do the police do, or what would happen if a person went outside the courtroom and hurt somebody. The court observed that any suggestion of defendant's culpability, or the possibility of conviction was "quickly curtailed by defendant's repetitive and single theme responses of: 'I didn't do it,' 'I don't know,' or 'I don't approve [because I didn't do anything].'"

¶ 7. At the end of the hearing, the court stated that Dr. Linder's report did not provide a basis to conclude that defendant was incompetent. Although the court concurred with defense counsel that appellant seemed fixated on the idea that he should not be in court, knew nothing, and should go free, it was unable to conclude that the fixation was necessarily irrational or the product of mental illness. The court stated that the competency issue would be taken under advisement and its "perception is, today he just doesn't want to cooperate as opposed to being mentally incompetent."

¶ 8. In July 2000 the trial court requested the translation of a lengthy statement that defendant had filed with the court. In his letter, defendant affirms his innocence and recounts his relationship with the victim and other mutual friends and acquaintances. According to defendant, the victim insisted that defendant had bought the victim's van. This disagreement then evolved into disputes over money, vandalism, and social confrontations by the victim against defend-

ant. Defendant affirms that despite these disputes he never hurt the victim.

¶ 9. In October 2000 the court ordered an updated competency evaluation, after defendant filed a one page document with the court in "phonetic" English. Defendant's letter was interpreted, in pertinent part, as follows:

> I done my crime or attempted murder whatever I been charged. I am making my proof now. I just want to go for another court. To explain what our situation was with Elia Dinis .... Please somebody help me with this just to know how many year I am gonna get .... I apologize for being strong head please somebody answer to me thank you. I am ready to do my time for whatever I done.

¶ 10. Anticipating this second evaluation, defense counsel supplied a letter to the examining physician written by defendant in English. This document is a disjointed account of bizarre events that defendant claimed occurred during his childhood, including an electric shock, a tree branch penetrating his head, and being shot with a gun twenty times. The letter closes with the following statement: "I did stab Elia Dinis .... Just I want to know how many years I am going to get. If I been lying I am telling now. Also I want sentencing??."

¶ 11. Dr. Linder examined defendant and stated that "[a]n opinion that Nikoll Marku is *mentally competent to stand trial* ... would find support." (emphasis in original). Dr. Linder noted that defendant was more cooperative and that his understanding and use of English had improved. In significant contrast with the first evaluation and with defendant's previous denials, defendant now declared that he stabbed the victim. Defendant understood that the judge would decide his case. He indicated that he was aware of his trial rights, but that he would not

need a jury because he would admit to committing the crime. Defendant was aware that he could be exposed to a lengthy sentence, and expressed an interest in plea bargaining.

¶ 12. On March 16, 2001, after considering the second report, the court found that appellant was competent to stand trial. The trial court issued a meticulous memorandum of decision detailing the information in the psychiatric reports and the court's own perceptions of defendant at the hearings. The court concluded that it was "clearly convinced that defendant's perception of the process is not distorted by mental illness or disability, that he recalls and can relate facts concerning the alleged offense, that he is reasonably intelligent, and that he can consult with a lawyer if he so chooses." The court suggested that defendant's bizarre behavior in jail and his superstitious beliefs could be a basis for an insanity defense, but they did not interfere with his ability to stand trial.

¶ 13. The plea hearing took place on August 21, 2001. Because defense counsel still expressed concerns about his client's competence, the court had ordered yet another psychiatric evaluation of defendant. The examination occurred on August 20, and Dr. Linder's report of the results was admitted by stipulation. The report concluded that defendant was competent, his adjustment disorder was resolving, and his history of regressive deterioration while incarcerated had improved. During the hearing, defense counsel declined to call Dr. Linder to the stand. The court, however, conducted an in-depth inquiry of Dr. Linder. Under the court's questioning, Dr. Linder testified about defendant's improvements in comprehension and cooperation during the last interview. Dr. Linder opined that defendant's acceptance of criminal responsibility and his desire to plead guilty were reasonable and not the product of delusional or irrational thought. He further indicated that it was difficult to

assess whether some of the bizarre thoughts and events expressed in defendant's letters were psychotic, but they did not seem to have an impact on defendant's behavior or decision-making process.

¶ 14. Following Dr. Linder's testimony, the court proceeded to the Rule 11 colloquy. The court explained to defendant the content of the plea agreement:

> [The court:] Mr. Marku, I'm looking at a plea agreement, which is a deal between you and the State, that would have you plead guilty to attempting to murder, that is to kill, Mr. Dinis, and in return the State will try to persuade the court that you should go to jail from 35 years to life, and you and [defense counsel] can argue to the court that you should not go to jail for so long. And the State will also dismiss an aggravated assault charge against you and two simple assault charges against you as part of this deal. Is that your understanding of the agreement today?

> [Defendant:] Yes sir ... I agree with this, guilty. I am guilty. I stabbed him.

¶ 15. The court then informed defendant of the rights he would waive by pleading guilty. Defendant indicated that he understood each of the rights and was willing to forfeit them. At the end of the colloquy, defendant confirmed that he wanted to plead guilty to the attempted murder charge:

> [The court:] Mr. Marku, what is your plea to the charge that you attempted to murder Mr. Dinis?

> [Defendant:] Yes, sir.

> [The court:] And is your plea guilty or not guilty?

> [Defendant:] Guilty.

> [The court:] Guilty means you did it, you understand?

> [Defendant:] (Unclear). I did it. Yes sir.

> [The court:] The State must prove that ... you are a person who attempted to willfully murder, that means, intended to kill, and tried to kill Ilia Dinis —

> [Defendant:] Yeah.

> [The court:] — by doing great bodily harm to him by stabbing him, but because Mr. Dinis didn't die and you ran away, you were not able to complete killing him.

> [Defendant:] I did run away.

> [The court:] I'm sorry.

> [Defendant:] So he did — I did run away, sir. I am guilty so I plead guilty.

> [The court:] Right; is that what happened? And is it true that you wanted to kill him?

> [Defendant:] I run with the knife. The don't (unclear). I plead guilty. ... I wanted to kill him.

> [The court:] You did want to kill him.

> [Defendant:] Yes.

¶ 16. After defense counsel stipulated to a prima facie case, the court accepted the plea. At the sentencing hearing, defendant did not claim that he had misunderstood the plea, or that he wanted to withdraw it. The court sentenced defendant to thirty-five years to life. This appeal followed.

¶ 17. Defendant first claims that he was not competent to enter a guilty plea.

Defendant claims that defendant's statements, Dr. Linder's first report, and the court's findings after the first competency hearing provided an ample basis to doubt defendant's competency.

¶ 18. The competency standard to plead guilty is the same as the standard required to stand trial. *State v. Lockwood*, 160 Vt. 547, 554, 632 A.2d 655, 660 (1993). The test is "whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding — and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam); accord *State v. Bean*, 171 Vt. 290, 294, 762 A.2d 1259, 1262 (2000).

¶ 19. We will not overturn the trial court's competency determination if it is supported by findings, and if the findings are supported by credible evidence and are not clearly erroneous. *State v. Thompson*, 162 Vt. 532, 535, 650 A.2d 139, 141 (1994); *Bean*, 171 Vt. at 296, 762 A.2d at 1263. Here, the court issued a lengthy memorandum of decision, containing numerous findings in support of its determination that defendant was competent. The court relied on two uncontested psychiatric reports and its own interactions with defendant to state that it was "clearly convinced that defendant's perception of the process is not distorted by mental illness . . . , that he recalls and can relate the facts concerning the alleged offense, that he is reasonably intelligent, and that he can consult rationally with his lawyer if he so chooses." Moreover, the third psychiatric report — admitted by stipulation at the plea hearing — corroborated the court's earlier findings and further supported the court's determination that defendant was competent to enter a plea. Therefore, the court's competency ruling was not error.

¶ 20. Defendant next claims that the trial court erred by accepting defendant's guilty plea because the record does not

reveal that it engaged in the complete colloquy required by Rule 11 of the Vermont Rules of Criminal Procedure. Defendant claims that, despite the presence of an interpreter, many of defendant's answers to the court's questions were repeatedly transcribed as "unclear," and the record of the hearing does not contain an actual entry of a plea. According to defendant, the court also failed to obtain a factual basis for the plea, neglected to explain the nature of the charge, and thus had no assurance that defendant's plea was knowing, intelligent, and voluntary.

¶ 21. "Rule 11 is designed to 'assure compliance with the requirements set forth in *Boykin v. Alabama*, 395 U.S. 238, 242-43 (1969): that a defendant's plea of guilty must be knowing and intelligent.'" *State v. Cleary*, 2003 VT 9, ¶ 15, 175 Vt. 142, 824 A.2d 509 (quoting *State v. Yates*, 169 Vt. 20, 25, 726 A.2d 483, 486 (1999)). The court must satisfy itself that the defendant is pleading voluntarily and understands the consequences of the plea. *In re Hall*, 143 Vt. 590, 594, 469 A.2d 756, 757-58 (1983). Rule 11(c) requires the court to address the defendant, explaining to him and determining that he understands: the nature of the charge to which the plea is offered; the minimum and maximum penalty; that he has the right to plead not guilty; and that he is waiving his rights against self-incrimination and to a jury trial. V.R.Cr.P. 11(c); *Cleary*, 2003 VT 9, at ¶ 15. Rule 11(d) requires the court to address the defendant to determine that the plea is voluntary, and Rule 11(f) requires an inquiry into the factual basis or accuracy of the plea. See V.R.Cr.P. 11(d), (f); *Yates*, 169 Vt. at 25, 726 A.2d at 487.

¶ 22. A defendant who fails to object to an error during the plea colloquy may obtain reversal only upon a showing of plain error. *Cleary*, 2003 VT 9, at ¶ 16. We require only substantial compliance with the requirements of Rule 11, and we will not reverse if the alleged violation is

merely a technical violation. See *State v. Morrissette*, 170 Vt. 569, 571, 743 A.2d 1091, 1092-93 (1999) (mem.); *In re Thompson*, 166 Vt. 471, 475, 697 A.2d 1111, 1113 (1997). Appellant must establish that the noncompliance with Rule 11 affected his substantial rights. See V.R.Cr.P. 52(b).

¶ 23. We begin by observing that some of the alleged procedural defects were simply the consequence of an incomplete transcript of the plea hearing record. The parties stipulated to a corrected record, which was subsequently certified by the trial court. The corrected record — which we have cited above — contains defendant's entry of a guilty plea. The record also reveals that the court explained to defendant the nature of the charge, and that, by pleading guilty, he would be giving up his right to call witnesses, testify in his own defense, and confront adverse witnesses. The court inquired of defendant whether he understood, and defendant responded affirmatively. Therefore, we discern no error in the court's compliance with those Rule 11 requirements.

¶ 24. The record also belies defendant's assertion that the court did not conduct an inquiry into the factual basis or accuracy of the plea. The accuracy of the factual basis ensures the voluntariness of the plea, insofar as it serves to guarantee that defendant understands the relationship between the law and the facts. See *Yates*, 169 Vt. at 26, 726 A.2d at 487. Therefore, the court must explain the law in relation to the facts. *In re Kaspar*, 145 Vt. 117, 119, 483 A.2d 608, 609 (1984). Here, the court plainly explained the elements of attempted murder, stating that "[t]he State must prove that . . . you are a person who attempted to willfully murder, that means intended to kill, and tried to kill Ilia Dinis . . . by doing great bodily harm by stabbing him, but because Mr. Dinis didn't die and you ran away, you were not able to complete killing him." Defendant admitted that he

wanted to kill the victim, that he stabbed him in the neck, and that he ran away. Defendant, through his attorney, stipulated to a prima facie case. The record thus shows that the court substantially complied with the Rule 11(f) requirements. See *State v. Blish*, 172 Vt. 265, 275, 776 A.2d 380, 388 (2001) (Defendant's admissions during the plea colloquy that he had perpetrated the unlawful killing of victim, and that he had knowingly created a very high risk of bodily harm or death by pointing a gun at victim's face and pulling the trigger, established the factual basis for the crime of second-degree murder, and in so doing demonstrated defendant's understanding of the relationship between the law and facts, as element for establishing the voluntariness of the plea.); *Cleary*, 2003 VT 9, at ¶ 29. Defendant's claim that the court should have explained the possible mens rea defenses of diminished capacity and insanity has no merit. We have never held that the court needs to address available defenses to negate the elements of the crime. In any event, this omission cannot be plain error where defendant admitted to the requisite mens rea by stating that he wanted to kill his victim, and where the trial court specifically found in the competency determination that defendant was aware that an insanity defense was available.

¶ 25. Defendant also asserts that the trial court violated Rule 11(c)(5) because the court never informed him of his right to withdraw the plea should the court refuse to impose a sentence within the parameters established in the plea agreement. See V.R.Cr.P. 11(c)(5); *State v. Turgeon*, 161 Vt. 561, 561, 641 A.2d 88, 89 (1993) (mem.). The purpose of Rules 11(c)-(d) is to assure that a plea is knowingly and voluntarily made, and to that end we require practical application of the rule rather than a technical formula. See *Morrissette*, 170 Vt. at 571, 743 A.2d at 1092-93; *Thompson*, 166 Vt. at 475, 697 A.2d at 1113. The court's omission had no

effect on any substantial right of defendant because defendant's sentence was within the limits agreed to by the parties. Reversal for this technical defect is not warranted where, as here, we have determined that there has been substantial compliance with the requirements of Rule 11.

*Affirmed.*