## State of Vermont v. Roy Johnson

[615 A.2d 132]

No. 90-578

Present: **Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.**

Opinion Filed May 22, 1992

510

*William Sorrell*, Chittenden County State's Attorney, and *Pamela Hall Johnson*, Deputy State's Attorney, Burlington, for Plaintiff-Appellee.

*Charles Martin* of *Martin & Paolini*, Barre, for Defendant-Appellant.

**Johnson, J.** Defendant appeals from a first-degree murder conviction. He argues that (1) the evidence, when viewed most favorably to the State, failed to establish causation; (2) the trial court's instructions regarding malice and evidence of other crimes constituted·plain error; (3) the court committed reversible error by allowing a sequestered juror to return from emer-

gency leave without determining whether he had been preju-
dicially influenced against defendant; (4) the court's examina-
tion of an expert witness put into doubt the impartiality of the
trial; and (5) the conviction is void because due process requires
that a charge carrying a life sentence be brought by grand jury
indictment rather than by information. We affirm.

I.

Defendant contends that the court erred by not granting his
motion for judgment of acquittal because the evidence was in-
sufficient for the jury to conclude that his conduct proximately
caused the victim's death. Viewing the evidence in the light
most favorable to the State, and excluding the effect of modify-
ing evidence, *State v. Papazoni*, 157 Vt. 337, 338, 596 A.2d 1276,
1276 (1991), we conclude that there was sufficient evidence for
the jury to find causation.

Aside from the testimony of the state medical examiner, most
of the direct evidence in the case was supplied by an eye wit-
ness, who recounted a sequence of bizarre events culminating in
the abandonment of the victim in the Lamoille River. In the
early morning hours of May 31, 1989, following a night of imbib-
ing alcohol and driving from one location to another, defendant,
the victim, and the witness arrived at a spot along the river.
Defendant, who allegedly had already attempted to asphyxiate
the victim only an hour or so earlier, drove his car into the vic-
tim soon after they arrived. Apparently, the victim was bruised
and in pain but not seriously injured.

Defendant then pushed the victim into the river. As the victim
stood in two or three feet of water, defendant threw an eight- or
nine-inch rock at him, and was about to throw another larger
rock when the witness intervened. Shortly thereafter, defend-
ant threw the victim's wallet farther out into the river, purport-
edly to induce him to proceed deeper into the water. Defendant
knew that the victim was in his sixties, in poor health, gullible,
and drunk. He also knew that the victim believed the wallet
contained a significant amount of money. The victim did indeed
swim farther out into the cold water. Failing to retrieve the wal-
let, he remained afloat by clinging to a branch of a half-sub-
merged tree that extended into the river. Defendant rejected a
suggestion that they rescue the victim, stating, "He's history.

He knows too much." Apparently, this statement was in reference to a crime spree of the preceding days, in which defendant had the victim write worthless checks for a variety of valuable items. Defendant and the witness left, and sometime that morning the victim drowned.

■■ A person is responsible for a death proximately caused by criminal conduct, even though the person's conduct was not the immediate cause of death. *United States v. Guillette*, 547 F.2d 743, 749 (2d Cir. 1976). When the immediate cause of death is the natural result of the accused's conduct, the chain of direct legal causation remains unbroken. *Id.*; *State v. Yudichak*, 151 Vt. 400, 403, 561 A.2d 407, 409 (1989). This principle applies even when the victim sets in motion the immediate cause of death. Accordingly, "if a person acting on a well grounded and reasonable fear of death or bodily injury induced by an accused's threats or actual assaults, dies in an attempt to extricate himself from the danger, the accused bears criminal liability for the death." *Guillette*, 547 F.2d at 749 (defendants criminally responsible for victim's death, even assuming victim planted the bomb that killed him to protect himself from defendants' attempts to dissuade him from testifying); see also *State v. Myers*, 7 N.J. 465, 475, 81 A.2d 710, 715 (1951) (first-degree murder conviction upheld where wife jumped into river and drowned after husband struck her several times and told her to jump in).

■■ We recognize that the witness was intoxicated at the time these events took place, that he interacted with the other two men throughout the entire episode and may have had reason to inculpate defendant, that cross-examination brought to light many inconsistencies in his story, and that he testified that he believed the victim did not want to return from the river and was sitting in the tree waving goodbye as the other two men left. Assessing the credibility of witnesses, however, is the province of the jury, *State v. Jost*, 127 Vt. 120, 128, 241 A.2d 316, 322 (1968), and there was ample evidence for a reasonable jury to conclude that, to silence the victim, defendant intended to cause his death by luring or frightening him into the river in his inebriated condition. Not only was there evidence of a motive for the killing, but there was also evidence that defendant had attempted to kill the victim earlier by asphyxiation, and that

the victim's body had bruises and abrasions that could have been caused by an automobile driven at a slow speed. Given this evidence, the jury could have concluded that, even if the victim had an opportunity to return to shore, he was afraid to do so for fear of defendant, and that his death was the natural result of defendant's conduct.

■ Defendant correctly points out that "the causal connection between the death of the decedent and the unlawful acts of the [defendant] cannot be supported on mere conjecture and speculation." *State v. Rounds*, 104 Vt. 442, 457, 160 A. 249, 254 (1932). In *Rounds*, there was some question as to whether the decedent died from blows suffered in a fistfight a month earlier or from injuries resulting from a fall out of his hospital bed. Noting that some of the defendant's blows had been struck in self-defense, the Court concluded that there was no competent evidence tending to establish that death resulted from any "unlawful" blows. *Id.* at 455–56, 160 A. at 253. Here, the evidence, not mere conjecture, supports the reasonable conclusion that defendant intended to cause the death of the victim. See *Papazoni*, 157 Vt. at 339, 596 A.2d at 1277 (despite reasonable possibility that victim of vehicular homicide was attempting to commit suicide, there was sufficient evidence for jury to conclude that death resulted from the defendant's recklessness); *State v. Norton*, 147 Vt. 223, 231, 514 A.2d 1053, 1058 (1986) (although no witness observed victim's death, evidence was sufficient for jury to find that the defendant forced victim over edge of quarry to his death).

## II.

■ ■ Next, defendant argues that parts of the court's charge constituted plain error. There are no precise criteria for determining whether plain error exists. See *State v. Ross*, 152 Vt. 462, 474, 568 A.2d 335, 342 (1989) (Morse, J., dissenting); 3A C. Wright, Federal Practice and Procedure § 856, at 337 (2d ed. 1982) ("the cases give the distinct impression that 'plain error' is a concept appellate courts find impossible to define, save that they know it when they see it"). In general, we must examine the record in each case, and determine whether the error is so prejudicial that "it undermines confidence in the outcome of the trial." *United States v. Sblendorio*, 830 F.2d 1382, 1388 (7th Cir.

1987), *cert. denied,* 484 U.S. 1068 (1988); see *United States v. Young,* 470 U.S. 1, 16 (1985) (reviewing court must evaluate claim of plain error against entire record of case). Only in extraordinary cases will we find plain error. *State v. Mecier,* 145 Vt. 173, 178, 488 A.2d 737, 741 (1984).

### A.

 Defendant first contends that the court committed plain error by allowing the jury to consider defendant's failure to rescue as evidence of malice or intent to kill. The challenged charge reads as follows:

> The law imposes no general duty to rescue. Hence if Defendant was not responsible for the victim's peril, but merely failed to attempt a rescue, such failure does not constitute any crime charged in this case. Although not a crime, you may consider any failure to rescue as possible evidence of malice or intent if you conclude that Defendant had the capacity, means and ability to make a rescue.

We agree that the last sentence was inaccurate because if the jury had concluded that defendant was not responsible for the victim's peril, defendant would not be guilty of the charged crime and there would be no need to consider whether malice or intent was present. Nevertheless, there was no plain error. This particular charge followed a detailed statement by the court explaining that the jury must find that defendant's conduct was both the cause in fact and the proximate cause of the victim's death. The jury could not reasonably have construed the charge as a whole to mean that defendant could be criminally responsible for his failure to rescue even if he did not put the victim in peril. Given this conclusion, it would have been proper for the jury to consider defendant's failure to rescue in determining whether defendant intended to kill the victim. See *State v. Cole,* 150 Vt. 453, 456, 554 A.2d 253, 255 (1988) ("Intent is rarely proved by direct evidence; it must be inferred from a person's acts and proved by circumstantial evidence."); see also 2 W. LaFave & A. Scott, Substantive Criminal Law § 7.2(b), at 193 (1986) (intent to kill must be gathered from killer's actions and words in light of the surrounding circumstances).

### B.

Defendant also claims that the court's malice instruction con-

stituted plain error because (1) it combined the elements of malice and intent, thereby allowing the jury to convict defendant on the first-degree murder charge without finding that he intended to kill; and (2) the third component of the court's definition of malice is so similar to the criminal negligence standard that it allowed the jury to convict defendant of murder based on facts that justify only a conviction of involuntary manslaughter. Although we find no plain error, we take this opportunity to clarify the concepts of malice and intent as they relate to first- and second-degree murder.

Murder is defined most frequently as the unlawful killing of a person with "malice aforethought." 2 LaFave & Scott, *supra*, § 7.1, at 181. Although some courts continue to define the term "malice aforethought" with archaic phrases such as "evil disposition," "wicked purpose," and "heart fatally bent on mischief," those phrases do not approximate the term's literal meaning in modern times, and indeed it is doubtful that an "ill-will" element was ever required for a murder conviction. See *id.* at 181–82; *People v. Woods*, 416 Mich. 581, 622–24, 331 N.W.2d 707, 726–27 (1982). Initially, the malice element simply meant a premeditated intent to kill without legal justification. See 2 LaFave & Scott, *supra*, at 182. As the common law developed, the definition of malice expanded to include an intent to cause serious bodily injury or an extreme indifference to human life, which encompassed what is commonly called "depraved-heart murder." *Id.* at 182–83; see *State v. Doucette*, 143 Vt. 573, 582, 470 A.2d 676, 682 (1983). The courts began to use the phrase "malice aforethought, express or implied"; "express" malice referred to murder with a premeditated intent to kill, while "implied" malice referred to depraved-heart murder, felony murder, or unreasonable "heat of passion" murder. See 2 LaFave & Scott, *supra*, at 182–83.

In the nineteenth century, a majority of the states divided murder into degrees to graduate punishment on the basis of culpability and to narrow the category of capital offenses. See *id.* § 7.7, at 236; *People v. Aaron*, 409 Mich. 672, 718, 299 N.W.2d 304, 321 (1980). Since then, many jurisdictions with statutes similar to ours have held that a conviction of premeditated first-degree murder requires that the State prove that the defendant intended to kill. See *State v. Lacquey*, 117 Ariz. 231, 234, 571

P.2d 1027, 1030 (1977) ("to show premeditation and deliberation, the State must prove that the defendant made a decision to kill prior to the act of killing"); *People v. Alexander*, 140 Cal. App. 3d 647, 665, 189 Cal. Rptr. 906, 916 (1983) ("Except where the felony murder rule is applicable, first degree murder must be predicated on express malice—the defendant must specifically intend to kill."); *Hounshell v. State*, 61 Md. App. 364, 371, 486 A.2d 789, 793 (1985) (first-degree murder—wilful, deliberate, premeditated— "is the actual intent coupled with the fully-formed malicious purpose to kill"); *People v. Garcia*, 398 Mich. 250, 259, 247 N.W.2d 547, 550 (1976) (statute prohibiting wilful, deliberate and premeditated killing requires that there be an "intent to accomplish the result of death"); *State v. Jones*, 303 N.C. 500, 505, 279 S.E.2d 835, 838 (1981) ("intent to kill is an essential element of [premeditated] first degree murder"); *Commonwealth v. Weinstein*, 499 Pa. 106, 115, 451 A.2d 1344, 1348 (1982) (Commonwealth must prove that the defendant specifically intended to kill in order to establish premeditated first-degree murder). But cf. *Commonwealth v. Puleio*, 394 Mass. 101, 108, 474 N.E.2d 1078, 1083 (1985) (conviction of first-degree murder may rest upon showing that the defendant "intended to do an act creating a plain and strong likelihood that the victim's death or grievous harm would follow").[1] As Justice Traynor explained:

> [The wanton disregard for human life] mental state must be distinguished from the state of mind described as "wilful,

---

[1] The holding in *Commonwealth v. Puleio*, 394 Mass. 101, 108, 474 N.E.2d 1078, 1083 (1985), is not that different from our holding today because, as noted above, intent to kill can be proved by showing that the defendant was aware that death was substantially certain to occur. Moreover, the Massachusetts statute differs from ours in that first-degree murder is, among other things, "'[m]urder committed with deliberately premeditated malice aforethought.'" *Id.* at 107, 474 N.E.2d at 1082 (quoting G.L. c. 265, § 1). Thus, the statute requires that the malice, rather than the killing, be premeditated.

At least one federal case, construing a federal murder statute similar to ours, see 18 U.S.C. § 1111 (1982), has suggested that the government need only show wanton disregard to support a conviction of either first- or second-degree murder. See *United States v. Shaw*, 701 F.2d 367, 392 n.20 (5th Cir. 1983), *cert. denied*, 465 U.S. 1067 (1984). That same case, however, held that deliberation and premeditation "involve a prior design to commit murder." *Id.* at 392.

deliberate, and premeditated . . . ." The latter phrase encompasses the mental state of one who carefully weighs the course of action he is about to take and chooses to kill his victim after considering the reasons for and against it.

*People v. Conley*, 411 P.2d 911, 918, 49 Cal. Rptr. 815, 822 (1966).

Vermont's murder statute, which has been left virtually unchanged since its enactment in 1869, provides as follows:

> Murder committed by means of poison, or by lying in wait, or by wilful, deliberate and premeditated killing, or committed in perpetrating or attempting to perpetrate arson, sexual assault, aggravated sexual assault, robbery or burglary, shall be murder in the first degree. All other kinds of murder shall be murder in the second degree.

13 V.S.A. § 2301. Early on, this Court stated that "[t]he statute has in no degree altered the common-law definition of murder." *State v. Tatro*, 50 Vt. 483, 494 (1878). In that same case, the Court concluded that to constitute a premeditated murder of the first degree, "the act must, indeed, be done with *malice aforethought*. And that malice must be *actual*, not *constructive*." *Id.* at 492 (emphasis in original). This statement made it clear that premeditated first-degree murder requires a showing of a "purpose and intent to kill." *Id.* at 494. Language from later cases supports such a conclusion. See *State v. Girouard*, 135 Vt. 123, 138, 373 A.2d 836, 846 (1977) ("It is axiomatic that murder in the first degree requires proof of murderous intent with a purpose of mind to kill as distinguished from an act done upon sudden impulse without meditation or murderous intent."); *State v. Carr*, 53 Vt. 37, 47 (1880) (same).

Other cases, however, could be construed to undermine such a conclusion. For example, in *State v. Battick*, 133 Vt. 558, 561, 349 A.2d 221, 223 (1975), the Court cited *Tatro* and *State v. Blair*, 53 Vt. 24 (1880), for the proposition that the malice required for premeditated first-degree murder can be either actual or constructive. In fact, *Tatro* stands for the opposite proposition, and *Blair* is completely unrelated to the issue addressed by the Court.

The Court in *State v. Doucette*, 143 Vt. at 582, 470 A.2d at 682, like the trial court here, defined malice as "an intention to kill, an intention to do great bodily harm, or a wanton disregard of

the likelihood that one's behavior may naturally cause death or great bodily harm." The Court took the malice definition from a Michigan felony-murder case, which held, as did *Doucette*, that the mental element of felony murder could not be presumed merely from an intent to commit the felony. See *Aaron*, 409 Mich. at 728, 299 N.W.2d at 326. Thus, *Aaron* and *Doucette* stand for the proposition that a killing during "the perpetration of a felony" is first-degree murder if, at a minimum, it evidences a wanton disregard of the likelihood that death will result. *Id.*; *Doucette*, 143 Vt. at 582, 470 A.2d at 682 (jury may convict a person of felony murder where evidence of malice indicates that the defendant "acted with extreme indifference to the value of human life"). This holding, which allows a first-degree felony murder conviction based on a showing of implied (constructive) malice, does not conflict with our affirmation of well established case law requiring a showing of intent to kill in premeditated murder cases.[2]

In short, whichever element intent is assigned to, see *In re Dunham*, 144 Vt. 444, 448, 479 A.2d 144, 146 (1984) ("wilful" element denotes intent to kill), we believe that the law of this state has always been, and we now expressly hold, that premeditated first-degree murder requires the State to prove intent to kill.[3] Case law that suggests otherwise is overruled to the extent that it is inconsistent with this affirmation of Vermont law. Our holding today does not concern felony murder or second-degree murder, in which the mental element may be premised on any of the three components of the definition of malice enunciated in *Doucette*. See *People v. Hill*, 94 Mich. App. 777, 782, 288 N.W.2d 408, 411 (1979).[4]

---

[2] We note that *State v. Battick*, 133 Vt. 558, 561, 349 A.2d 221, 223 (1975), also involved a felony murder. In that case, however, the Court indicated that the trial court found not only that the crime was committed during the perpetration of a felony, but that it was premeditated.

[3] Intent to kill may be found when the assailant desires that death result, or when the assailant knows or is substantially certain that death will result. 2 W. LaFave & A. Scott, Substantive Criminal Law § 7.2(a), at 191 (1986).

[4] Manslaughter is generally defined as an unlawful killing of a person absent malice aforethought. See *State v. Duff*, 150 Vt. 329, 331, 554 A.2d 214, 215 (1988). In straightforward terminology, voluntary manslaughter is an inten-

 Our holding does suggest that continued use of the archaic and arcane language associated with the word "malice" could only be a source of confusion to jurors. Accordingly, because the term "malice aforethought" has no real meaning other than denoting various mental states, see 2 C. Torcia, Wharton's Criminal Law § 137, at 170 (14th ed. 1979), and because it has been the source of much confusion in the case law and in jury instructions, see *Aaron*, 409 Mich. at 714, 299 N.W.2d at 319, the trial courts should refrain from using the term in jury instructions.[5] Rather than describing malice as a requisite element of murder, the trial courts should indicate the appropriate states of mind required for each type of murder. See *Woods*, 416 Mich. at 626, 331 N.W.2d at 727 (in order to make instructions "accurate, fair, and comprehensible to the average person," supreme court prohibited trial courts from using "malice" language in jury charge).

 Although we agree with defendant that the use of the tripartite definition of malice in the charge in this case had potential for confusion, we find no plain error. After explaining to the jury that malice is ill will, and that it could be shown "by callous and wanton disregard of the likelihood that one's behavior may naturally cause death or great bodily harm," or "by intent to do such harm or by intent to kill," the court defined premeditation and then instructed as follows:

> It is not enough that the Defendant is shown to have had time to premeditate. He must actually have premeditated *as well as actually intended to kill to be guilty of first degree murder*. (Emphasis added.)

---

tional killing committed under extenuating circumstances that would mitigate, but not justify, the killing, such as provocation that would cause a reasonable person to lose self control. See *State v. Wheelock*, 158 Vt. 302, 310, 609 A.2d 972, 977 (1992); 2 W. LaFave & A. Scott, Substantive Criminal Law § 7.10, at 252 (1986). Involuntary manslaughter is an unintentional killing where the assailant's failure to perceive the risk of death or injury constitutes gross negligence. *Wheelock*, 158 Vt. at 310, 609 A.2d at 977; *State v. Stanislaw*, 153 Vt. 517, 525, 573 A.2d 286, 291 (1990).

[5] We have the authority to restrict the use of the word "malice" because it is a common-law concept that has not been incorporated into 13 V.S.A. § 2301. See *People v. Woods*, 416 Mich. 581, 626–27 n.14, 331 N.W.2d 707, 727 n.14 (1982).

The court explicitly stated that the State must prove *each* element beyond a reasonable doubt, and that the element of premeditation requires that defendant actually intend to kill. Viewed in its entirety, the charge did not constitute plain error. See *State v. Norton*, 147 Vt. at 235, 514 A.2d at 1061; see also *State v. Joy*, 452 A.2d 408, 411 (Me. 1982) (murder case in which court held that a charge strictly conforming to current law can hardly be called plain error).

Other jurisdictions, in similar situations, have refused to find reversible error. For example, in *People v. Johnson*, 93 Mich. App. 667, 670–72, 287 N.W.2d 311, 313–14 (1979), the defendant argued for the first time on appeal that the court's charge, which included the same tripartite definition of malice charged here, permitted the jury to convict him of first-degree murder based on the conclusion that he created a high risk of death rather than that he intended to kill. The appellate court acknowledged that an actual intent to kill was required to convict a person of first-degree murder other than felony murder, but concluded that on the whole the charge was proper because the court had also instructed the jury that a first-degree murder conviction required an intent to kill. *Id.*; see also *Williams v. Abshire*, 544 F. Supp. 315, 320 (E.D. Mich. 1982) (no error where court gave implied malice definition but also instructed the jury that intent to kill was required for crime charged); *People v. Ogen*, 168 Cal. App. 3d 611, 618–19, 215 Cal. Rptr. 16, 20 (1985) (no error where court instructed on malice in general, defined express malice, and then indicated that premeditated murder requires a showing of express malice); cf. *People v. Murtishaw*, 29 Cal. 3d 733, 763, 631 P.2d 446, 463–64, 175 Cal. Rptr. 738, 755–56 (1981) (implied malice and intent-to-kill instructions cannot coexist; however, charge was not prejudicial because evidence showed a virtual certainty that the defendant intended to kill his victim).

Considering all the evidence presented in the case, the state of the law on malice, and the trial court's explicit instruction on intent to kill, reversal is not warranted. See *People v. Burgess*, 96 Mich. App. 390, 399–400, 292 N.W.2d 209, 213 (1980) (although court should have made the distinction between the mental states required by express and implied malice, its failure to do so was not plain error considering the evidence of

intent to kill and the court's instruction that the evidence must show "a preconceived design to 'take the victim's life' ").

 Nor is reversal warranted by the similarity of the language of the implied malice instruction and the involuntary manslaughter instruction. Both instructions included language referring to a wanton disregard for the risk of death or serious bodily injury. Immediately preceding the malice instruction, however, the court explained that an act of murder must be "done on purpose, [] to be distinguished from accidental or mistaken." As stated, the court also charged that a first-degree murder conviction requires the jury to find that defendant actually intended to kill. On the other hand, the court defined involuntary manslaughter as "the killing of another human being but not accompanied by any intention to take life." The court further explained that involuntary manslaughter is the result of recklessness or "a gross deviation from the standard of care that a reasonable person would observe in the same situation." The jury convicted defendant of first-degree murder. Because the instructions plainly stated the different mental elements required for convictions of first-degree murder and involuntary manslaughter, there is no plain error, if any error at all.[6]

## C.

 Defendant also argues that the court's instruction allowing the jury to consider evidence that he aided the victim in passing bad checks was plain error because it permitted the jury to consider his character in determining his guilt. We disagree.

---

[6] In another case issued today, *State v. Brunell*, 159 Vt. 1, 7, 615 A.2d 127, 131 (1992), we pointed out that the difference between the implied intent to kill required for a second-degree murder conviction, and the criminally negligent conduct required for an involuntary manslaughter conviction, is "the defendant's awareness of the risk and the degree of that risk." To be convicted of murder, the defendant must be subjectively aware of a very high risk of death or serious bodily injury, while the defendant convicted of involuntary manslaughter need not be aware of the risk, which is somewhat less than the risk in the case of murder. *Id.*; see *People v. Watson*, 30 Cal. 3d 290, 296, 637 P.2d 279, 283, 179 Cal. Rptr. 43, 47 (1981) (though definitions of implied malice and gross negligence bear a general similarity, they are not the same; implied malice "contemplates a subjective awareness of a higher degree of risk than does gross negligence").

The court instructed as follows:

> There has been some discussion in this case about other crimes than homicide. The Defendant here is charged with one crime only. He is accused of murdering [the victim]. However, in considering the evidence you may consider the following, if you deem it pertinent.
>
> Passing checks for which there are not sufficient funds to cover those checks is a crime. A person who aids in such a crime or counsels or solicits another to commit such a crime, is himself guilty of that crime.

The court did not specifically state that evidence of passing bad checks could be considered only as evidence of a motive for the killing, the purpose for which it was presented. Nevertheless, considering that the court informed the jury that defendant was charged with only one crime, and that the uncharged bad acts were unrelated to the charged crime, we find no plain error. See *State v. Holcomb*, 156 Vt. 251, 256, 590 A.2d 894, 897 (1991) (no plain error where uncharged bad act was entirely different and thus created no risk that jury would use the evidence as proof that the defendant was predisposed to commit charged crime).

### III.

▮▮▮ Defendant argues that the trial judge also committed plain error by intervening excessively on behalf of the State when he asked the state medical examiner several questions concerning the possible effects of hypothermia. According to defendant, testimony elicited by the judge allowed the State to prove its case by establishing that hypothermia may have caused the victim to slip from the tree into the water where he drowned.

Defendant's argument is without merit. The medical examiner had already testified that hypothermia could have resulted in the victim's impaired judgment and loss of consciousness. The court asked whether such impaired judgment would have outward manifestations obvious to the average person, and the examiner answered that in an extreme case, a victim may have difficulty grasping objects or attempting to rescue himself. In further response to the court's inquiry, the examiner stated that

he had no opinion as to whether any such manifestations occurred in this instance. The intervention here cannot be compared to the intervention that occurred in the cases cited by defendant, where the court's statements and examination of the witnesses gave the impression that the judge favored the prosecution. See *United States v. Singer*, 710 F.2d 431, 436 (8th Cir. 1983) (judge coached the prosecution "throughout the entire proceeding"); *West v. State*, 519 So. 2d 418, 421 (Miss. 1988) (thirty interventions, twenty of which the judge coached the prosecutor on what to ask). Here, on one occasion the judge attempted to clarify testimony that had become confused during several redirect and recross examinations. There was no abuse of discretion on the court's part. See V.R.E. 614(b) ("court may interrogate witnesses, whether called by itself or by a party"); *State v. Shaw*, 149 Vt. 275, 281–82, 542 A.2d 1106, 1109–10 (1987).

## IV.

Next, defendant argues that the court erred by permitting a juror to separate from a sequestered jury during trial and then failing to examine the juror, or the court officer who accompanied him, in order to assure that the juror was not prejudicially influenced against defendant during his absence. This argument is also without merit. On the second day of trial, before any testimony was heard, the trial court informed counsel that it was considering allowing one of the jurors, who was the associate director of the University of Vermont's physical plant, to leave for two hours to respond to an emergency situation at one of the university dormitories. The court stated that "a court officer will be with [the juror] at all times so that he won't discuss the case or hear about the case with anybody." The court allowed the juror to leave despite the objection of defendant, which was predicated on his concern that the juror's departure would "delay the trial." Before the juror left, the court told the officer "to ensure that nobody discusses the case with [the juror]," and warned the juror not to discuss the case with anyone. Approximately two hours later, the juror returned and the trial proceeded without the court examining the officer or the juror, and without any request for such an examination.

As defendant points out, one claiming an impartial jury due to "any suspicious taint by extraneous influences"

need only "demonstrate that the irregularity had the capacity to influence the result, not that it actually did so." *State v. Griffin*, 152 Vt. 41, 45, 563 A.2d 642, 645 (1989); see *State v. Onorato*, 142 Vt. 99, 106, 453 A.2d 393, 396 (1982) (reversible error occurs when, "upon discovering the possibility of jury prejudice," the court "fails to voir dire the jury to determine if in fact any prejudice has been created"). Here, however, there was absolutely no indication of extraneous influence upon the juror. Cf. *Onorato*, 142 Vt. at 105, 453 A.2d at 396 (during overnight recess, juror heard that the trial was defendant's second trial); *State v. Woodard*, 134 Vt. 154, 155, 353 A.2d 321, 321 (1976) (juror overheard telephone conversation in which the defendant stated that he was hung unless he had an alibi). Consequently, the court's failure to examine the officer or the juror was not reversible error, if error at all.

## V.

 Finally, defendant asserts that prosecution by information in cases where the defendant is charged with crimes punishable by life imprisonment violates Chapter I, Article 10 of the Vermont Constitution, which provides, in part, that no person can be "justly deprived of his [or her] liberty, except by the laws of the land, or the judgment of his [or her] peers." We disagree.

In *State v. Stimpson*, 78 Vt. 124, 139, 62 A. 14, 19 (1905), this Court ruled that the above constitutional provision "does not require common law felonies to be prosecuted by indictment." The Court based its decision on the fact that the challenged statute in that case, which allowed state's attorneys to prosecute most crimes by information, provided the due process of law required by the Constitution. *Id.* at 133–39, 62 A. at 17–19. At this time, the procedure for prosecuting persons is governed by V.R.Cr.P. 7, which provides that "[a]ny offense may be prosecuted by indictment or information at the option of the prosecuting officer." As stated in the reporter's notes to that rule, "[t]he protection of an independent finding of probable cause which the indictment gives the defendant is amply supplied by the provisions of Rules 4(b) and 5(c), which require such a finding by a judicial officer in the case of a prosecution upon information." Given this protection, we see no reason to overturn

established law and practice by holding that the Vermont Constitution requires prosecution by indictment for crimes carrying a life sentence. See *State v. Barr*, 126 Vt. 112, 117, 223 A.2d 462, 466 (1966).

*Affirmed.*