2010 VT 83

## State of Vermont v. Christopher A. Williams

[8 A.3d 1053]

No. 08-469

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed August 26, 2010

---

*Thomas Donovan, Jr.*, Chittenden County State's Attorney, and *Pamela Hall Johnson*, Deputy State's Attorney, Burlington, for Plaintiff-Appellee.

*Matthew F. Valerio*, Defender General, and *Anna Saxman*, Deputy Defender General, Montpelier, for Defendant-Appellant.

¶ 1. **Johnson, J.** Defendant Christopher Williams appeals his conviction of two counts of first-degree murder, one count of attempted first-degree murder, and one count of attempted second-degree murder arising out of a series of shootings at two residences and an elementary school in Essex, Vermont. Defendant was subsequently sentenced to three terms of life without parole and one term of twenty to twenty-five years of imprisonment. On appeal, defendant argues that the trial court erred in: (1) instructing the jury on diminished capacity for a lesser-included offense of voluntary manslaughter; and (2) failing to suppress statements obtained in violation of *Miranda*. We affirm.

¶ 2. On August 24, 2006, police responded to a report of gunshots being fired on Stannard Road in Essex, Vermont at the home of Linda Lambesis. Upon arriving at the scene, police discovered the body of Linda Lambesis, who had been shot at close range and killed. Defendant, who was dating Linda's daughter, Andrea, and who had been living at the Lambesis home until the previous day, was identified as the shooter. Shortly thereafter, police received another report of gunshots being fired at Essex Elementary School, where Andrea Lambesis was working as a teacher. Upon arrival at the school, officers discovered the body of Alicia Shanks, a teacher whose classroom was located adjacent to Andrea's, who had also been shot at close range and killed, as well as Mary Snedeker, another teacher, who had been shot and was seriously injured. Several teachers at the school identified defendant as the shooter, but defendant had fled the scene by the time officers arrived.

¶ 3. Officers then received yet another report of gunshots fired at an apartment complex on Jericho Road in Essex. Upon arrival

at the scene, officers discovered another victim, Chad Johansen, a friend of defendant. Johansen had suffered a gunshot wound, but was still alive. Officers found defendant lying on the ground in front of the apartment complex and bleeding from his head from a self-inflicted gunshot wound. Without reading him his *Miranda* rights, police handcuffed defendant and questioned him about the location of victims and the location of the gun. Defendant was then transported by ambulance to Fletcher Allen Hospital, and was interrogated continuously over the next five hours both in the ambulance and at the hospital.

¶ 4. In the middle of the interrogation and after being admitted to the hospital, defendant was read his *Miranda* rights. The questioning continued and concluded at approximately 8:00 p.m. Immediately following the interrogation, a new officer arrived at the hospital, Officer Grajales, and began an overnight shift guarding defendant. Though Officer Grajales did not ask defendant any questions and testified that his only duty was to guard defendant, defendant apparently made several unsolicited statements over the course of Officer Grajales' guard shift. These statements consisted of defendant's admissions to the shootings, expressions of incredulity and remorse for what he had done, and questions about how his culpability might be mitigated. Defendant moved to suppress all of the statements he made to police concerning the shootings.

¶ 5. Following a suppression hearing, the trial court granted defendant's motion as to most of the statements, concluding that defendant was unequivocally in custody while at the hospital and that even though the officers eventually gave defendant a *Miranda* warning, the fact that it came mid-interrogation did not isolate the post-warning statements from the illegal interrogation. The court, however, denied the motion as to statements made to police at the crime scene concerning the location of the gun and other victims under the public safety exception to *Miranda.* The court also denied the motion as to the statements defendant made to Officer Grajales, concluding that these statements were entirely voluntary and were not part of the illegal interrogation.

¶ 6. At trial, defendant did not deny committing the shootings; rather, his sole theory of the case was that the combination of his cognitive deficits, dissociative state at the time of the shootings, delusions about whether Andrea had an affair with his father, and cocaine use the night before the shootings all acted to mitigate

murder to manslaughter. In support of this theory, defendant offered expert psychiatric testimony indicating that he had a very low IQ and would have difficulty planning and carrying out actions and that he suffered some dissociation on the day of the shootings. He also presented testimony from eyewitnesses at the scenes of the shootings who testified that his hair was unkempt and that he looked strange that day.

¶ 7. The State countered defendant's theory primarily with testimony from defendant's own psychiatric experts, neither of whom offered any support for a theory that at the time of the shootings defendant's ability to form the requisite intent to commit premeditated murder was compromised by any mental defect or condition, and in fact, offered the opposite conclusion: that defendant possessed the capacity to form the requisite intent for all of the shootings. In support of its case, the State presented testimony from Andrea's and defendant's friends and family who testified that defendant was angry at Andrea and Linda for asking him to leave the Lambesis home. The State also presented testimony from three people whom defendant encountered the day of the shootings, seeking to show that defendant used these three people — in the form of car rides and in one case, borrowing the murder weapon — to carry out the shootings. The State also presented testimony from eyewitnesses as well as crime scene investigators who testified that all of the shootings occurred at close range.

¶ 8. At the conclusion of evidence, defendant requested the following instructions: an instruction on the lesser-included offense of second-degree murder; an instruction on the lesser-included offense of voluntary manslaughter; and an instruction on insanity. The court gave all three instructions, though defendant objected to the substance of the voluntary manslaughter instruction. Defendant was subsequently convicted of first-degree murder of Linda Lambesis and Alicia Shanks; attempted first-degree murder of Mary Snedeker; and attempted second-degree murder of Chad Johansen. This appeal followed.

## I.

¶ 9. We begin with defendant's challenge to the jury instruction on the lesser-included offense of voluntary manslaughter. The court instructed the jury that:

> Voluntary manslaughter is an intentional unlawful killing of another human being committed under extenuating circumstance that would mitigate but not justify the killing, such as a killing committed while under the influence of a mental condition, not necessarily amounting to insanity, which would cause a reasonable person to lose his self-control.

Defendant argues that the court erred in using a "reasonable person" standard to measure his conduct rather than a subjective standard that considered the effects of his particular mental condition. While we agree that the court's instruction was erroneous, we conclude that the error was harmless because defendant was not entitled to a voluntary manslaughter instruction based on diminished capacity.

■ ■ ¶ 10. The court correctly stated that "voluntary manslaughter is an intentional killing" that is "committed under extenuating circumstances that would mitigate, but not justify, the killing." *State v. Johnson*, 158 Vt. 508, 518 n.4, 615 A.2d 132, 138 n.4 (1992); see also *State v. Blish*, 172 Vt. 265, 270, 776 A.2d 380, 385 (2001) ("It is well established in Vermont that voluntary manslaughter is an intentional killing committed under extenuating circumstances that may negate willfulness . . . ." (quotation and brackets omitted)). There are two bases for mitigating first- or second-degree murder to voluntary manslaughter. The first, which is not at issue in this case, includes "provocation that would cause a reasonable person to lose self control." *State v. Delisle*, 162 Vt. 293, 301, 648 A.2d 632, 637-38 (1994) (quotation omitted). To establish provocation, the facts must show: "(1) adequate provocation; (2) inadequate time to regain self-control or 'cool off'; (3) actual provocation; and (4) actual failure to 'cool off.' " *State v. Kulzer*, 2009 VT 79, ¶ 25, 186 Vt. 264, 979 A.2d 1031 (quotation omitted). Thus, the test is not only whether an individual defendant was sufficiently provoked into violent action, but whether a reasonable person in his or her position would have been so provoked.

¶ 11. The second ground, which defendant relied upon here, is based on a defendant's diminished capacity due to mental disabilities that do not necessarily amount to insanity. *State v. Sexton*, 2006 VT 55, ¶ 13, 180 Vt. 34, 904 A.2d 1092 (Vermont has long recognized that "diminished capacity due . . . to a mental

disability can mitigate murder to voluntary manslaughter" (citations omitted)). The "traditional rationale" for such mitigation is that a "defendant's decreased faculties or awareness may preclude [his ability to form] the specific intent to commit murder." *Id.* (citation omitted); see also *State v. Duff*, 150 Vt. 329, 331, 554 A.2d 214, 215 (1988) (diminished capacity "is predicated upon a finding by the jury that the defendant suffered from mental disabilities, not necessarily amounting to insanity," which preclude him from forming the necessary intent for the charged offense), *overruled on other grounds by State v. Powell*, 158 Vt. 280, 608 A.2d 45 (1992).

█ ¶ 12. The trial court properly instructed the jury on diminished capacity in discussing the intent elements of first- and second-degree murder. Thus, it stated that "[i]f you find that at the time of the offense [defendant] was suffering from a mental condition which prevented him from acting willfully, deliberately, [and] with premeditation . . . he is not guilty of first-degree murder." In a similar vein, the court instructed the jury that "[i]f you find that [defendant] suffered diminished capacity such that he did not form the specific intent for the offense of second-degree murder, you must find him not guilty of second-degree murder and consider the lesser-included offense of voluntary manslaughter." The court also correctly emphasized that in considering the elements of the offense and the principle of diminished capacity, the State had the burden of proving the requisite mental elements of the offense. See, e.g., *State v. Messier*, 145 Vt. 622, 629, 497 A.2d 740, 744 (1985) ("When the defendant puts in issue whether he had the mental state required for the offense charged, the State's burden of proof remains unchanged. The State must prove beyond a reasonable doubt every element of the crime charged.").

█ ¶ 13. The court erred, however, in including language from the provocation standard in its voluntary manslaughter instruction here. The use of a reasonable person test is inconsistent with a defense of diminished capacity due to a mental condition, which necessarily requires consideration of a particular defendant's ability to form the intent to kill. One must apply a subjective rather than an objective standard in such cases. Nonetheless, as stated above, the error is harmless.

■ ■ ¶ 14. It is elemental that there must be a nexus between a defendant's mental condition — in this case, defendant's alleged cognitive deficits, dissociative state, jealous delusion, and voluntary intoxication — and his ability to form the intent required for murder. See, e.g., *State v. Delibero*, 692 A.2d 981, 986 (N.J. 1997) ("[D]iminished capacity refers to evidence that can negate the presence of an essential mental element of the crime . . . . A jury considers evidence of diminished capacity in relation to the State's burden to prove the essential elements of the crime." (quotation and citation omitted)); *State v. Austin*, No. W2005-01963-CCA-R3-CD, 2007 WL 2624399, at **5-6 (Tenn. Crim. App. Sept. 10, 2007) (concluding that any error in excluding parts of expert testimony concerning diminished capacity defense was harmless where the expert "did not testify that the [defendant] was incapable of forming the requisite mental states because of the [defendant's] mental disease"); *State v. Guilliot*, 22 P.3d 1266, 1272 (Wash. Ct. App. 2001) (concluding that psychiatric testimony offered by a defendant in support of his diminished capacity defense was properly excluded because it failed to establish a link between the defendant's mental condition and his ability to form the culpable mental states at the time of the offense and therefore would not have assisted trier of fact). That critical link was missing in this case. Thus, despite the defect in the trial court's instruction, we uphold defendant's conviction because the facts in evidence, as discussed below, did not warrant the voluntary manslaughter instruction at all. See *State v. Joy*, 149 Vt. 607, 610, 549 A.2d 1033, 1035 (1988) (trial court need only instruct the jury on the elements of lesser-included offenses that are fairly raised; it need not charge on a theory not supported by the evidence).

¶ 15. Defendant offered a four-part diminished capacity theory at trial: (1) he had severe cognitive deficits; (2) he suffered from a dissociative state at the time of the shootings; (3) he suffered from a jealous delusion as a result of his belief that Andrea was unfaithful to him; and (4) he was suffering from the effects of cocaine use at the time of the shootings.

¶ 16. In support of the first ground, defendant relied heavily on testimony from Dr. Sandra Solomon. Dr. Solomon testified that: defendant had an IQ of between 66 and 71, which meets the criteria of mild mental retardation (though Dr. Solomon did not diagnose defendant as mentally retarded); defendant tested well below the average in terms of his vocabulary; and defendant

exhibited compromised abstract conceptualization functioning and moderate to severely compromised executive functioning, which includes goal planning and self-monitoring. Dr. Solomon concluded that the combination of these impairments indicates that during times of stress defendant "probably doesn't have the ability to consider the consequences of his actions."

¶ 17. Support for defendant's dissociative state theory came primarily from Dr. Robert Linder. On direct examination, Dr. Linder testified that his psychiatric evaluation of defendant indicated an ongoing theme that defendant was suicidal and had nothing to live for and that he felt "unstoppable" and unlike his usual self on the day of the shootings. Defendant also told Dr. Linder that after the shooting at the Lambesis home the entire situation became like an "illusion." Based on his evaluation of defendant, Dr. Linder believed that the "degree of dissociation during the time . . . that he was at the school might reduce to some degree a conscious, executive, thinking, and planning involved."

¶ 18. Defendant attempted to bolster this theory with testimony from several people who had observed defendant on the day of the shootings. For instance, several teachers at the elementary school, as well as other individuals who had contact with defendant that day, testified that defendant's hair was disheveled — specifically, that half of his hair was in braids while the other half was unkempt.

¶ 19. Finally, in support of his jealous delusion and voluntary intoxication theories, defendant relied on testimony from Dr. Linder, primarily in the form of repeating defendant's self-reports of his belief that Andrea had had sex with his father, an event which Andrea denied and which was highly implausible, and his self-reported crack cocaine use the night before the shootings.

██ ¶ 20. As noted, however, defendant's diminished capacity theory was premised on an inaccurate perception of voluntary manslaughter. Rather than making the critical connection between diminished capacity and intent, defendant attempted to cobble together multiple mental conditions in the hopes that his diminished capacity defense would add up to more than the sum of its parts. Indeed, defendant did not present any evidence at trial establishing this crucial nexus. Instead, defendant's theory posited diminished capacity as an "extenuating circumstance" to generally

mitigate culpability, a theory that creates an unworkable standard for voluntary manslaughter.[1] Dr. Solomon's testimony, for instance, failed to shed any light on the possible effect that defendant's cognitive deficits had on his state of mind at the time of the shootings. Indeed, in the course of the evaluation, the subject of the events of August 24, 2006 did not come up for discussion. Nor were the events leading up to the shootings discussed. Dr. Solomon expressed "no opinion" as to defendant's sanity on the day of the shootings and "no opinion" as to whether information gleaned from her evaluation shed any light on defendant's capacity to understand the actions that he was taking in carrying out the shootings. In addition, defendant's second psychiatric expert, Dr. Linder, explicitly refuted Dr. Solomon's conclusions as to defendant's mental functioning, and testified that, in his opinion, defendant functioned at a higher level than that indicated by Dr. Solomon's report. Even if the jury accepted Dr. Solomon's testimony over Dr. Linder's assessment, Dr. Solomon's testimony was insufficient to make a connection between low mental functioning and inability to form intent to kill.

¶ 21. Cross-examination of Dr. Linder also severely undermined defendant's dissociation theory. When asked whether he believed defendant's alleged dissociation had any effect on defendant's knowledge of right and wrong and his awareness of the consequences of his actions, Dr. Linder refuted any connection between the dissociation and defendant's ability to appreciate the consequences of his actions. Moreover, Dr. Linder explicitly rejected the existence of any nexus between defendant's proclaimed dissociative state at the time of the shootings and his ability to form requisite intent to murder. Dr. Linder testified that though defendant may

---

[1] This is not the first time we have addressed the appropriate scope of "extenuating circumstances" under our voluntary manslaughter definition. In *State v Shaw*, for instance, we addressed the defendant's argument that "imperfect self-defense" could also form the basis of a voluntary manslaughter instruction, on the theory that "his actual and honest self-defense motive was an extenuating circumstance that should mitigate murder to voluntary manslaughter, just as heat of passion or diminished capacity are extenuating circumstances that mitigate murder to manslaughter." 168 Vt. 412, 416, 721 A.2d 486, 490 (1998). We noted that this theory was an impermissible extension of "heat-of-passion manslaughter" and that though we had recognized that sudden emotion arising from adequate provocation could serve to reduce a murder conviction to manslaughter, we have not allowed "mitigation of murder to manslaughter based on an unreasonable but honest belief that deadly force was necessary." *Id.* at 417, 721 A.2d at 491.

have appeared to be in an "altered state" while at the school, this dissociation did not rise to the level of being a "mental disease or defect." Nor was it Dr. Linder's opinion that the dissociation diminished defendant's capacity to form the specific intent to commit premeditated murder. Dr. Linder rejected the idea that defendant was on "automatic pilot" at the school, testifying that "these . . . were very defined and specific activities that he engaged in and not sort of the . . . random type of things . . . that you might see in somebody who is sleeping or in . . . some other kind of trance state." Finally, as to the standards for the legal definition of both insanity and diminished capacity, Dr. Linder testified that, in his opinion, defendant did not meet the definition of insanity in carrying out any of the shootings, nor was it Dr. Linder's opinion that defendant had diminished capacity to form the requisite intent to shoot and kill any of the victims that day.

¶ 22. Dr. Linder also rejected a connection between any "jealous delusion," stemming from defendant's account that he observed Andrea and defendant's father having sex and defendant's ability to act with intent to kill. As to cocaine use, testimony on whether defendant was under the influence of cocaine at the time of the shootings was equivocal at best. Dr. Linder testified that defendant first reported using cocaine, but then later stated that he had not used cocaine. Dr. Linder also testified that defendant told him that he stopped smoking crack cocaine at approximately 4:00 a.m. the morning of the shootings, and that it was Dr. Linder's belief that defendant would have "withdrawn" by 10:00 a.m. Thus, Dr. Linder concluded that defendant's cocaine use would not have affected his ability to form a specific intent to commit murder.

¶ 23. Finally, Dr. Linder's testimony cast serious doubt about whether defendant was entirely truthful during the evaluation. Dr. Linder indicated that the drastically different accounts defendant gave during the later interview, in which defendant appeared to display a variety of symptoms that did not fit into any diagnostic category, indicated that defendant may have been malingering. Indeed, Dr. Linder was doubtful about whether defendant had been entirely truthful in his self-reports of his mental processing leading up to and during the shootings. Further, the devil terminology that defendant used during the later interview — which included telling Dr. Linder that "there was something not human in the house" and that defendant wanted "to kill the devil" and was going to the Lambesis home to do that, did not appear

credible to Dr. Linder because this description did not come up in any of the three depositions of the people defendant claims to have spoken to about it.

■ ■ ¶ 24. Moreover, not only did the State adequately rebut defendant's diminished capacity defense, but it also provided ample evidence in support of intent.[2] The State charged defendant with first-degree murder of Linda Lambesis and Alicia Shanks, and attempted first-degree murder of Mary Snedeker and Chad Johansen. As stated above, to prove the element of intent for first-degree murder, the State needed to show that defendant: (1) acted with intent to kill, do great bodily harm, or with wanton disregard of the likelihood that his behavior would naturally cause death or great bodily harm; and (2) acted willfully, deliberately, or with premeditation. See 13 V.S.A. § 2301; *State v. Hatcher*, 167 Vt. 338, 343, 706 A.2d 429, 432 (1997). The State's proof that defendant acted with a premeditated plan to murder his victims was demonstrated in three ways: (1) through crime scene investigation testimony with regard to location of victims and shots fired; (2) through testimony from people defendant encountered on the day of the shootings; and (3) through cross-examination of defendant's psychiatric expert.

¶ 25. Through crime scene investigation testimony, the State presented evidence from eyewitnesses as well as police investigators indicating that multiple shots had been fired at close range at the Lambesis home; that multiple shots were fired at close range in Alicia Shanks' classroom; and that defendant saw Mary Snedeker through a classroom window and fired directly at her also at close range. This testimony indicated that the shootings

---

[2] We note that this situation stands in contrast to the circumstances at issue in *State v. Jackowski*, 2006 VT 119, ¶ 19, 181 Vt. 73, 915 A.2d 767. There, we addressed a challenge to an erroneous jury instruction on the element of intent. The State argued that even if the instruction did not adequately state the law on intent, such error was harmless because the evidence demonstrated beyond a reasonable doubt that the defendant acted with actual intent to commit the crime at issue. We noted that where "intent is the central — and only — issue, and the defendant presents minimally sufficient evidence rebutting intent, we cannot say that an erroneous jury instruction on that issue amounts to harmless error." *Id.* ¶ 12. Unlike the trial court in *Jackowski*, which erred in its instruction on an essential and contested element, here, the trial court adequately instructed the jury on the intent elements of first- and second-degree murder. The instruction was erroneous only as to the voluntary manslaughter offense, an instruction to which defendant was not entitled.

were not random, but were in fact carried out purposely and with calculation.

¶ 26. The State also presented testimony from Norman LaRock, Joseph Finch, and Chad Johansen, who testified as to their interactions with defendant prior to and immediately following the shootings. On the day of the shootings, defendant went to a local autobody shop, where he spoke with his mechanic, Norman LaRock. LaRock testified that defendant was upset over his fight with Andrea and that he had been asked to leave the Lambesis home. LaRock also testified that defendant asked LaRock if he killed himself, would he go to heaven; stated that maybe "he should go over there and kill them"; and stated "I'll do the crime. I can do the time." The State next offered testimony from defendant's cousin Joseph Finch, who drove defendant to the Lambesis home at defendant's request and who testified that just prior to the shootings at the Lambesis home, defendant appeared calm. Defendant apparently told Finch he needed to pick up his clothes and "figure out stuff," but as Finch drove away from the house, he heard gunshots and screams.

¶ 27. The State also submitted testimony from Chad Johansen regarding Johansen's interaction with defendant both before and after the shootings. Johansen testified that prior to the shootings defendant asked to borrow Johansen's gun, which was later determined to be the weapon used in all of the shootings. Defendant told Johansen that he needed the gun because he had been robbed and wanted to get his money back. Johansen also testified as to defendant's demeanor and statements immediately following the shootings at the Lambesis home and at the school. Johansen testified that defendant told him he had shot Andrea's mother and her friend and that defendant looked scared and "worried about the consequences." Defendant asked Johansen to take him to Massachusetts, and Johansen refused. Defendant then expressed a desire to kill himself, and Johansen handed defendant a new clip. Defendant tried, unsuccessfully, to shoot himself. Defendant then became agitated when he thought Johansen was speaking to the police and subsequently shot Johansen in the head.

¶ 28. This testimony demonstrated that defendant, angry with Andrea and Linda, formed a plan for revenge, was concerned about the possible consequences of his plan, and asked various

people for help along the way to carry out his plan. Indeed, cross-examination of defendant's psychiatric expert, Dr. Linder, buttressed this theory. Dr. Linder testified that defendant's actions indicated that he was "savvy" and "clever" in "accomplish-[ing] what he was setting out to do" on the day of the shootings. Dr. Linder came to this conclusion after observing that defendant told each of the three people he encountered prior to the shootings (Norman LaRock, Joseph Finch, and Chad Johansen) a different story, and each story allowed defendant to continue on with his plan without arousing suspicion. For instance, he told Johansen that he was robbed and that is why he needed a gun, and he told his cousin that he needed a ride to the Lambesis home so that he could get his clothes. Dr. Linder testified that defendant's actions in carrying out the shootings at the school continued to demonstrate organized and planned behavior: defendant drove directly to Essex Elementary School, where Andrea worked, instead of, for example, just driving his car until it ran out of gas like a dissociative person might have done. Taken together, this evidence was adequate to meet the State's burden of proof on the element of intent. See, e.g., *Hatcher*, 167 Vt. at 344, 706 A.2d at 433 ("A defendant's mental state may be inferred from the facts and circumstances surrounding the killing, as well as the manner of death.").

¶ 29. Given defendant's failure to put forth even minimally sufficient evidence in support of diminished capacity, a voluntary manslaughter instruction was not warranted, and the erroneous instruction given by the trial court was harmless. This situation stands in stark contrast to cases in which there were at least some facts to support a lesser-included instruction. See *State v. Yoh*, 2006 VT 49A, ¶ 20, 180 Vt. 317, 910 A.2d 853 (concluding that it was error for court to refuse to instruct on voluntary manslaughter where evidence indicated that the defendant "snapped" and strangled his wife following the deterioration of their marriage); *Delisle*, 162 Vt. at 301-02, 648 A.2d at 638 (concluding that because evidence showed that the victim and the defendant were in a deteriorating love affair, the victim had told defendant that she had a "dark tale to tell," and the manner of death was manual strangulation, "[t]hese facts could conceivably have led the jury to conclude that this was an unlawful killing committed in the heat of passion"). In contrast, defendant here provided no basis to challenge the intent element of murder that

would justify the lesser-included offense of voluntary manslaughter.[3]

## II.

¶ 30. Defendant also claims that the trial court erred in failing to suppress the statements made to Officer Grajales while defendant was in the hospital, arguing that the statements were obtained in violation of Article 10 of the Vermont Constitution as the fruit of the initial unwarned and illegal interrogation.

¶ 31. As stated above, in its decision on defendant's suppression motion, the trial court essentially divided the contested statements into four parts: (1) statements following immediate questioning upon apprehension of defendant at the crime scene concerning location of the gun and potential victims; (2) statements following questioning by officers in the ambulance and at the hospital that took place prior to *Miranda* warnings; (3) statements following questioning by officers that took place immediately following the *Miranda* warnings; and (4) statements made to Officer Grajales.

¶ 32. As to the first phase of questioning, the court denied defendant's motion to suppress, concluding that the public safety exception to *Miranda* applied because the statements were made in response to police questions concerning the identity and location of other victims and the gun's location. Defendant does not appeal this determination. With regard to the second and third phases of the encounter, the court granted defendant's motion to suppress and concluded that because the questioner remained the same, there was significant overlap in the questioning, and there were multiple references back to previous questions throughout both the pre-*Miranda* and post-*Miranda* phases, "[t]he interview was essentially continuous and was interrupted only by breaks for medical treatment and examination." Finally, as to the fourth phase, the court determined that the statements made to Officer Grajales were entirely voluntary and "were not made in response to any questions posed by the officer." Thus, the statements defendant made were not subject to the *Miranda*

---

[3] We note defendant was similarly not entitled to an instruction on diminished capacity with regard to the intent element of first- and second-degree murder. Because this instruction accurately reflected the standard for diminished capacity and its connection to the ability to form the requisite intent, we conclude that inclusion of the instruction in the first- and second-degree murder instructions was harmless error.

exclusionary rule, and defendant's motion to suppress them was denied.

¶ 33. On appeal, defendant challenges the court's ruling only as to the statements made to Officer Grajales, which consisted of the following: "I can't believe I just killed two people"; inquiry into whether Vermont has the death penalty; "my ex-girlfriend's mom was trying to save her"; "I don't know what . . . I was thinking"; "I'm going to have to suffer for the rest of my life"; "I can't believe I did that. Love is crazy, I just got sick of it"; "I took two people out, I'll probably get life"; "Do they have manslaughter? I could cop out for those two people I killed"; inquiry about accessory charges against Johansen; and "There were shootings everywhere . . . house, school, my friend's house. My friend should not have given me that gun." Officer Grajales also testified that defendant was at times "smirking" during the encounter and that he appeared "flippant."

¶ 34. Defendant argues that the statements made to Officer Grajales were part of a continuous five-hour interrogation in which defendant was questioned in detail about the shootings. Citing *State v. Badger*, 141 Vt. 430, 450 A.2d 336 (1982), he argues that the unwarned interrogation conducted at the hospital infected the voluntariness of his later statements and that there were no intervening events to break the causal chain. In support of his argument, defendant points to the following: the statements made to Officer Grajales were made in close succession following the five-hour interrogation; the statements repeated many of the statements made during the illegal interrogation; and the statements occurred while defendant was still in police custody and handcuffed to his hospital bed. Defendant contends that the erroneous admission of these statements was prejudicial because the statements were used to show that defendant understood the possible consequences of his actions, was not remorseful, and was lucid following the shootings, thus undercutting defendant's diminished capacity defense.

¶ 35. We need not address the substance of defendant's constitutional claim, however, because we conclude that even if the trial court erred in denying defendant's motion to suppress the statements made to Officer Grajales, such error was harmless. Error is harmless if we can say beyond a reasonable doubt that the jury would have convicted absent the error. V.R.Cr.P. 52(a)

("Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded."); *State v. Lipka*, 174 Vt. 377, 384, 817 A.2d 27, 33 (2002). The two most important factors employed in our inquiry are (1) "the strength of the prosecution's case without the offending evidence"; and (2) "the strength of the offending evidence." *Lipka*, 174 Vt. at 385, 817 A.2d at 34. Under this analysis, we also "consider the extent to which the offending evidence was inculpatory, whether it was cumulative or duplicative of other evidence, and how prominent it was at trial." *State v. Mumley*, 2009 VT 48, ¶ 20, 186 Vt. 52, 978 A.2d 6.

¶ 36. Turning first to the strength of the prosecution's case against defendant, there was ample evidence supporting defendant's convictions, specifically evidence that defendant possessed the requisite mental state for murder. As noted above, in support of its case, the State offered substantial evidence, which not only rebutted defendant's diminished capacity defense, but provided a basis on which a jury could conclude that defendant acted willfully, deliberately, and with premeditation in killing Linda Lambesis and Alicia Shanks and attempting to kill Mary Snedeker, and that he acted with specific intent in attempting to kill Chad Johansen.

¶ 37. The State offered testimony from three people who interacted with defendant on the day of the shootings — Chad Johansen, Norman LaRock, and Joseph Finch — who testified that defendant talked of the possible consequences of the shootings and asked them for help in the form of car rides and access to a weapon to carry out the murders. The State also offered testimony from medical examiners and forensic investigators, who testified as to the location of the victims, the fact that multiple shots were fired, and the fact that defendant shot all of his victims at close range. Finally, the most persuasive evidence of defendant's intent to murder came from cross-examination of defendant's own psychiatric expert, Dr. Linder. As stated above, Dr. Linder indicated his belief that defendant was capable of, and indeed did, commit the murders and attempted murders with deliberation and premeditation.

¶ 38. Turning to the strength of the offending testimony, we agree with the State that the statements defendant made to Officer Grajales were largely duplicative of admissible statements defendant made to a number of people about the shootings. See

*Kulzer*, 2009 VT 79, ¶ 20 (noting that "the cumulative nature of the [erroneously admitted] testimony significantly diminishes its strength"); *State v. Persuitti*, 133 Vt. 354, 339 A.2d 750 (1975) (concluding that admission of statements obtained in violation of a defendant's constitutional rights was harmless error because, in part, identical statements to the ones in question were properly before the jury).

¶ 39. The State introduced testimony from Chad Johansen, whom defendant spoke with immediately following the shootings at the Lambesis home and at the school. Johansen testified that defendant admitted to shooting Linda Lambesis and the two teachers and that defendant looked scared and "worried about the consequences." He told Johansen that he wanted to commit suicide, and attempted to do this in Johansen's presence. Defendant's concern about escaping possible punishment for what he did was also evidenced by Johansen's testimony that defendant asked Johansen to drive him to Massachusetts. Jay Simons, the Superintendant at the Chittenden Regional Correctional Facility where defendant was taken after he was released from the hospital, testified that upon arriving at the facility defendant said "I'm probably going to do a double life sentence for what I did. . . . It's the first time I ever shot anyone. . . . I should get a lighter sentence if I'm crazy, shouldn't I?" These statements, which included admission to the shootings, concern about the consequences, and concern about how the punishment might be mitigated, were largely duplicative of the statements defendant made to Officer Grajales.

¶ 40. Moreover, though defendant's statements to Officer Grajales indicate that defendant was aware of the consequences of his actions — indeed, the State used the statements to make this point during trial — they were relevant only to counter a credible diminished capacity defense, which defendant did not offer. Instead, for reasons stated above, defendant failed to provide evidence of his diminished capacity and its connection to his ability to form intent so as to justify a jury instruction on this defense. Cf. *State v. Shores*, 143 Vt. 224, 228, 465 A.2d 269, 271-72 (1983) (concluding that erroneous admission of a defendant's statements that he did not know why he entered the store he was alleged to have robbed was not harmless when defendant's entire theory of the case revolved around whether he had the requisite criminal intent, including testimony that he "blacked out" and had

no memory of the events in question). The fact that the State had ample evidence to demonstrate that defendant possessed the requisite state of mind for the crimes charged without the statements made to Officer Grajales combined with the cumulative nature of the statements lead us to conclude that any error in admitting these statements was harmless beyond a reasonable doubt.

*Affirmed.*